798 A.2d 648 (2002)
351 N.J. Super. 385
Jeannette TYNAN, Plaintiff-Appellant,
v.
VICINAGE 13 OF the SUPERIOR COURT of New Jersey, Angela Pardo, Eugene L. Farkas, and Sue Regan, Defendants Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted May 1, 2002.
Decided May 31, 2002.
*650 Edward G. O'Byrne, Totowa, for appellant.
David Samson, Attorney General, for respondents (Patrick DeAlmeida, Deputy Attorney General, of counsel; Meryl G. Nadler, Deputy Attorney General, on the brief).
Before Judges CONLEY, A.A. RODRIGUEZ and LEFELT.
*649 The opinion of the court was delivered by LEFELT, J.A.D.
Defendant Vicinage 13 of Superior Court terminated plaintiff Jeannette Tynan from her position as Hunterdon County Superior Court Jury Manager when she failed to return to work after an eleven-month leave. Tynan appeals from the trial court's summary judgment dismissing her entire complaint against the vicinage and several individual supervisors including the count charging that defendants failed to accommodate her medical condition in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 to -42,(LAD). We affirm dismissal of most of the counts of plaintiff's complaint, but conclude that a factual dispute was present regarding whether defendants reasonably accommodated Tynan's disability and reverse and remand on that basis.

*651 I.
We recount the pertinent facts from plaintiff's perspective, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995), followed by the relevant procedural history. Tynan began working as the Jury Manager of Vicinage 13 Hunterdon County in May 1987. As jury manager, Tynan was responsible for providing the vicinage with both criminal and civil trial juries. For several years, the vicinage appeared to be satisfied with her performance and Tynan was happy with her working conditions.
In December 1993, however, defendant Angela Pardo became "Administrative Assistant/Court Operations for Vicinage 13" and Tynan's immediate supervisor. While Pardo has had several title changes, throughout the relevant period of this dispute she remained Tynan's supervisor. Tynan's difficulties with Pardo began in the summer of 1995. On July 18, 1995, Pardo issued Tynan a written performance warning for unauthorized absence from the workplace on July 3, 1995 and submission of a time sheet that did not reflect that Tynan left work in the middle of the day for an extended period of time. In addition, the warning was issued because Tynan failed to bring to Pardo's attention an error in the processing of juror payments from an invalid account and was covering up her mistake.
According to Tynan, she had broken her eyeglasses and because she was working late that evening she went to the mall to get them fixed. Tynan states that she submitted a time sheet that accurately reflected the hours she worked. It should be noted that this was not a time sheet that reported the specific activity being performed throughout the working day at particular time intervals. Instead, Tynan was merely obligated to report the total hours worked for the day.
With regard to the invalid account charge, the warning itself noted that by the time Pardo became aware of the problem, Tynan "had already contacted the County and negotiated an arrangement to have the checks covered...." Pardo wanted Tynan to advise her in the future of such problems so Pardo could provide direction. According to Tynan, Pardo grossly exaggerated the incidents and unjustifiably accused Tynan of misrepresentation, "dishonesty and poor judgment" and conduct "unbefitting the high level of responsibility and trust inherent in the position of Jury Manager." Further disciplinary action including termination was threatened if Tynan failed to improve her performance.
Tynan notified Pardo that these untrue accusations were aggravating and exacerbating her existing physical conditions. She provided Pardo with an MRI documenting an abnormal cranial condition causing migraine headaches. Tynan also told Pardo that her colitis and depression were aggravated by this disciplinary overreaction. Tynan asked that Pardo stop harassing her.
It should also be noted that the vicinage was aware that in 1990, Tynan's adult daughter became brain damaged in an alcohol related automobile accident. The daughter became an invalid requiring constant care. As a result of this tragedy, Tynan had been diagnosed with post-traumatic stress disorder.
Another incident cited by Tynan centered on Judge Andrew Smithson's unannounced visit to Hunterdon County Court to discuss the selection of a special jury panel for a capital murder trial. According to Tynan, Pardo accused her of improperly scheduling the meeting with Judge Smithson, which left Tynan "trembling and crying." The judge subsequently *652 wrote stating he had indeed come unannounced and that Tynan "was ... vital to the success of the long and difficult jury selection process." The judge's staff specifically asked that he "incorporate their praise and thanks for the job that Ms. Tynan performed."
On October 22, 1996, Pardo sent Tynan a second performance warning for several problems including a mix-up of grand jury dates. Pardo claimed that although Tynan corrected the date on the jury order, she failed to contact Pardo regarding that correction. In addition, Pardo charged that Tynan failed to respond to Pardo's request that Tynan obtain information needed from a vendor used by the jury manager's office for data processing services. Pardo needed the information in order to respond to an inquiry from the Finance Manager. In addition, according to Pardo, Tynan had failed to communicate to Pardo that an invoice from this vendor had not been paid for over a year.
Pardo charged Tynan with "insubordination" and a "pattern of behavior," and again, further disciplinary action was threatened including possible termination of Tynan's employment. Tynan explained that this exchange with Pardo "triggered every physical symptom that I had." Tynan said the discipline notice caused her to be physically sick. She was a "nervous wreck," her "blood pressure was sky high, with bloody diarrhea all weekend."
With regard to the need to correct the grand jury dates, Tynan contended that she had advised Pardo that she had recently been diagnosed with ulcerative colitis which was aggravated by stress. She advised Pardo that she had called in sick on Friday, because she had been up all night Thursday with a colitis attack. Tynan claims that Pardo told her she had to come in to work and that the date correction letters had to go out that date. Tynan stated she advised Pardo that she was very sick, but Pardo responded by telling her she had to come to work. According to Tynan, this further magnified her illness.
In February 1997, Tynan met with defendant Assistant Trial Court Administrator Sue Regan with respect to her work-place treatment. Tynan told her she wanted Pardo's harassing behavior toward her to stop and that it was affecting her health.
In January 1998, Tynan contacted the Human Resources Division in Trenton regarding those problems. Robert Battle the chief of EEO/AA suggested that Tynan contact Human Resources Director Rachel Morejon and explain to her the details of the situation.
Tynan explained that she met with Morejon because she "wanted the harassment to stop, I wanted it out in the open, and I wanted somebody to do something because I was sick and tired of being sick and tired." According to Tynan, Morejon stated that she could file a formal complaint, but Tynan stated that she wanted to handle the problem "administratively."
The Vicinage Assignment Judge assigned Regan to handle the situation and address Tynan's concerns. At a meeting with Regan, Tynan stated that she wished to perform her job in a non-stressful atmosphere and that her stomach got in knots whenever Pardo called. At this meeting, according to Tynan, she also submitted medical proof from her doctor.
Thereafter, Regan developed a five-point list of recommendations to handle the problem. The recommendations required the Human Resources Manager to present an overview to Pardo and Tynan as to their respective roles and how they relate to the organization. In addition, Tynan was to establish the goals and objectives *653 for her job and Pardo was "to be on site one day a week until there is improvement in the situation." Significantly, Pardo was to develop a plan with input from Tynan as to how "to improve the negative working relationship that exists." Regan was to meet with both parties in six months to review the status of these efforts. The assignment judge concurred in this five-point plan and directed Regan to monitor the situation.
Subsequently, a meeting was held on April 8, after the assignment judge had reiterated that both Tynan and Pardo were valued employees and that he wished for everyone involved to work out the situation. Tynan was concerned with the evaluations in her personnel file that according to her were false and misleading. However, Pardo refused to change her evaluations and stated that "I stand by everything I have written."
Shortly after the April 8 meeting, Tynan went on leave. After using her vacation and sick time, she applied for and was granted a family leave, which was scheduled to end on March 15, 1999, some eleven months after she went on leave.
Nothing further was done with respect to the Regan plan while Tynan was on medical leave. From time to time while she remained on leave, Tynan forwarded medical reports to Pardo. In September 1998, Dr. Jones recommended that Tynan remain on sick leave "while she is being treated for depression and hypertension." The doctor also recommended that "she avoid any contact with Angela Pardo because this seems to profoundly affect her condition."
In November 1998, the doctor noted that Tynan "must report to a different administration upon return" to work. Pardo discussed this note with defendant Eugene Farkas who claimed not to understand the request. Consequently, the vicinage ignored it.
Toward the end of her eleven-month leave on March 4, 1999, Tynan requested additional leave and noted in her letter to Pardo that her "physician will be preparing a letter indicating accommodations regarding my return to work at the end of the leave of absence." Pardo denied Tynan's request to extend her leave and insisted that she return to work or be considered to have resigned her position.
Tynan's March 12, 1999, letter to the assignment judge asked if she could appeal Pardo's denial of the extended leave request. In this letter, Tynan stated that she was "unable to return to work immediately due to medical problems directly attributable to my work situation." Tynan also explained that she was forced to make the leave request to Pardo, despite the fact that her "physician directed, in previous documentation to Human Resources Division... that I have no contact with [Pardo] due to the physical and emotional reaction that I have to her as the result of her treatment of me." Tynan then charged that "My disability has not been accommodated."
In the same letter to the assignment judge, Tynan noted that Pardo had ordered Tynan's office to be cleared out eleven days before the end of her Family Leave. In addition, Tynan then noted an "announcement of the positional change of [her] counterpart in Somerville to a Vicinage position that [she] would certainly have been qualified for, and of which [she] received no notification...." She also told the assignment judge that "[t]hese recent actions have exacerbated [her] physical and emotional disabilities."
On March 17, 1999, Farkas responded to Tynan in writing. He referenced Tynan's letter to the assignment judge but did not mention any accommodation that would be *654 considered and requested no meeting with Tynan to discuss her return. Moreover, no reference was made to Regan's five-point plan and instead, he noted that Tynan was expected to return to work on Monday, March 15, 1999, and that her failure "has been treated as a resignation of [her] employment with the Judiciary."
In October, 1999, Tynan filed her Superior Court complaint against defendants alleging that (1) defendants failed to accommodate her medical condition and in the alternative continued to harass her until she became disabled to work in her position with Pardo as her supervisor in violation of the LAD; (2) defendants created a hostile work environment contrary to the LAD; (3) defendants conduct constituted intentional infliction of emotional distress; (4), (5) and (6) defendants violated her liberty interests, property rights and civil rights under the State and Federal constitutions and 42 U.S.C.A. § 1983.
Defendants moved for summary judgment on the basis that Tynan's claims were time barred and that Tynan was not a qualified individual with a disability. In the interim Tynan had filed several expert reports, based on which the trial judge subsequently entered an order baring Tynan from calling as witnesses each of the individual authors of the reports.
The trial judge then granted defendants' motion for summary judgment. The judge was concerned with Tynan's failure during her leave to "specifically indicate what accommodation she is requesting," and that it would not be a reasonable accommodation to have Tynan report to a different administrator. In addition, the judge believed that "the individual himself or herself [must] indicate what the accommodation is that they are requesting and that it be a reasonable accommodation."
Regarding the hostile environment allegations, the judge believed that "all of the specific events that were presented to the Court occurred prior to 1997." Moreover, the judge found "that there were no specific facts that showed that there were pervasive or severe discrimination because of her disability." The judge did not "see anything here indicating that she was discriminated against because of her disability."
Finally, the judge noted Tynan's extended leave and commented that her job "required an individual to be on site ... somebody who was capable of performing this job; and Miss Tynan, at least, as of March indicates she was asking for additional leave and that she was not able to perform this job."

II.
We begin our analysis with the count in Tynan's complaint that we believe should not have been dismissed, charging that defendants failed to provide reasonable accommodation to her disability. Tynan contends in this count that defendants discriminated against her because they did not accommodate her disability.
Under the Americans with Disabilities Act (ADA) 42 U.S.C.A. § 12101 to § 12213, an employer commits unlawful discrimination if the employer does not reasonably accommodate the known physical or mental limitations of an otherwise qualified disabled employee unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C.A. § 12112(b)(5)(A).
The LAD does not specifically address reasonable accommodation, but our courts have uniformly held that the law nevertheless requires an employer to reasonably accommodate an employee's handicap. E.g., Viscik v. Fowler Equipment Co., 173 N.J. 1, 11, 800 A.2d 826; Bosshard v. *655 Hackensack University Medical Center, 345 N.J.Super. 78, 91, 783 A.2d 731 (App. Div.2001); Muller v. Exxon Research and Engineering Co., 345 N.J.Super. 595, 604, 786 A.2d 143 (App.Div.2001); Jones v. Aluminum Shapes, Inc., 339 N.J.Super. 412, 423, 772 A.2d 34 (App.Div.2001); Ensslin v. Township of North Bergen, 275 N.J.Super. 352, 364, 646 A.2d 452 (App. Div.1994), certif. denied, 142 N.J. 446, 663 A.2d 1354 (1995); Seiden v. Marina Assoc., 315 N.J.Super. 451, 465-66, 718 A.2d 1230 (Law Div.1998). The failure to accommodate is one of two distinct categories of disability discrimination claims; the other claim being disparate treatment discrimination, which is not present in this case. See Viscik, supra, at 11, 800 A.2d 831.
Department of Law and Public Safety regulations mirror the ADA and also require employers to make "reasonable accommodation to the limitations" of a disabled employee, "unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." N.J.A.C. 13:13-2.5(b). The regulations also require employers to "consider the possibility of reasonable accommodation before firing ... a person with a disability on the grounds that his or her disability precludes job performance." N.J.A.C. 13:13-2.5(b)(2).
An employer's duty to accommodate extends only so far as necessary to allow "a disabled employee to perform the essential functions of his job. It does not require acquiescence to the employee's every demand." Vande Zande v. State of Wis. Dep't of Admin., 851 F.Supp. 353, 362 (W.D.Wis.1994), aff'd, 44 F.3d 538 (7th Cir. 1995); Jones v. Aluminum Shapes, supra, 339 N.J.Super. at 428, 772 A.2d 34. See 42 U.S.C. § 12111(9)(B) (establishing examples of reasonable accommodations including "job restructuring, part-time or modified work schedules, reassignment to a vacant position"). If an employer reasonably determines that an employee because of handicap cannot presently perform the job even with an accommodation, then the employer need not attempt reasonable accommodation. E.g., Svarnas v. AT & T Communications, 326 N.J.Super. 59, 74-75, 740 A.2d 662 (App.Div.1999).
In contrast to the ADA, N.J.S.A. 10:5-5(q), the LAD definition of "handicapped" does not incorporate the requirement that the alleged handicapping condition result in substantial limitation of a major life activity. See Olson v. General Elec. Astrospace, 966 F.Supp. 312, 314-15 (D.N.J.1997); Illingworth v. Nestle U.S.A., Inc., 926 F.Supp. 482, 488 (D.N.J. 1996); Gimello v. Agency Rent-A-Car Sys., 250 N.J.Super. 338, 362, 594 A.2d 264 (App.Div.1991). "While there is some question whether some stress disorders constitute disabilities under the ADA, see Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580 n. 3 (3d Cir.1998) ... this is less likely to be an issue under the [LAD], which defines `handicap' more broadly than the ADA's comparable definition of `disability.'" Leshner v. McCollisters Transp. Syst. Inc., 113 F.Supp.2d 689, 692 fn. 2 (D.N.J.2000).
Indeed the LAD defines "handicapped" person in relevant part as one suffering from a "physical disability, infirmity... which is caused by ... illness, or from any mental, psychological, or developmental disability ... which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." N.J.S.A. 10:5-5(q). Because the purpose of the LAD is "to secure to handicapped individuals full and equal access to society, bounded only by the actual physical limits that they cannot surmount," the Act besides being quite broad must also be liberally *656 construed. Andersen v. Exxon Co., 89 N.J. 483, 495, 446 A.2d 486 (1982).
Our courts have found a broad array of medical conditions to be handicaps under the LAD, including obesity, Viscik, supra, 173 N.J. 9, 800 A.2d 826; alcoholism, Clowes v. Terminix Intern. Inc., 109 N.J. 575, 538 A.2d 794 (1988); epilepsy, Jansen v. Food Circus Supermarkets Inc., 110 N.J. 363, 365, 541 A.2d 682 (1988); and drug addiction, In re Cahill, 245 N.J.Super. 397, 585 A.2d 977 (App.Div.1991). By defining handicap broadly, the Legislature intends to focus scrutiny not on whether a particular employee's limitations qualify for protection, but on the work-site actions taken in light of whatever physical or mental limitations the worker presents. Thus, the LAD seeks to ensure that distinctions between people are "made on the basis of merit, rather than skin color, age, sex or gender, or any other measure that obscures a person's individual humanity and worth." Enriquez v. W. Jersey Health Sys., 342 N.J.Super. 501, 527, 777 A.2d 365 (App.Div.), certif. denied, 170 N.J. 211, 785 A.2d 439 (2001).
According to Tynan's physicians, she suffered from post-traumatic stress disorder, depression, irritable bowel syndrome, migraine headaches, hypertension, reflux esophagitis, and anxiety panic attacks. The migraine headaches, irritable bowel syndrome, reflux and hypertension are physical problems, while the post traumatic stress disorder, depression and panic attacks are psychological. Plaintiff thus claims to suffer from a combination of physical and psychological maladies, most associated with stress.
The trial judge commented that there "may be a question of fact as to whether Miss Tynan is disabled ... but we will accept that. We will give her all favorable inferences with regard to that." We agree with the trial judge's assessment and conclude that Tynan has at least set forth sufficient illnesses and psychological maladies to withstand summary judgment.
Regardless of Tynan's handicap under the LAD, however, the vicinage argues that Tynan never specifically requested an accommodation to perform her job. According to the vicinage, Tynan never requested an accommodation for stress and it has no record of any formal written request for a reasonable accommodation of her handicap. The only requests she made were to report to a different supervisor and to have her personnel records purged of the alleged erroneous warnings.
The vicinage thus argues that before it must provide any accommodation, the disabled employee must make a specific request advising the vicinage precisely what accommodation the employee seeks. We agree that under the law an employee must request an accommodation, but we disagree with the vicinage that the request must be as formal or specific as the vicinage appears to suggest.
Plaintiff informed the vicinage on more than one occasion that she was having problems and the accommodation she was seeking. The fact that the vicinage, perhaps rightly, rejected the specific requests that Tynan initially made to have her personnel file purged and not report to Pardo, does not excuse the vicinage from further action.
It is not necessary that requests for reasonable accommodations be in writing or even use the phrase "reasonable accommodation." Taylor v. Phoenixville School District, 184 F.3d 296, 313 (1999) (quoting EEOC manual). "[A]n employer cannot expect an employee to read its mind and know that he or she must specifically *657 say `I want reasonable accommodation.' " Ibid. (quoting Bultemeyer v. Fort Wayne Community Schools, 100 F. 3d 1281, 1286 (7th Cir.1996)). An employee may use plain English and need not mention the ADA or any other legal source requiring accommodation. Taylor, supra, 184 F.3d at 313. While there are no magic words to seek an accommodation, the employee, however, "must make clear that... assistance [is desired] for his or her disability." Jones v. United Parcel Service, 214 F.3d 402, 408 (3d Cir .2000) (quoting Taylor, supra, 184 F.3d at 313). Once such a request is made, "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Taylor, supra, 184 F.3d at 312 (quoting Mengine v. Runyon, 114 F. 3d 415, 419-20 (3d Cir.1997)).
To determine what appropriate accommodation is necessary, the employer must initiate an informal interactive process with the employee. 29 C.F.R. § 1630.2(0)(3). This process must identify the potential reasonable accommodations that could be adopted to overcome the employee's precise limitations resulting from the disability. Ibid. Once a handicapped employee has requested assistance, it is the employer who must make the reasonable effort to determine the appropriate accommodation. Taylor, supra, 184 F.3d at 311.
To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Id. at 319-20. See Jones v. Aluminum Shapes, supra, 339 N.J.Super. at 425, 772 A.2d 34 (Where the employer's good faith in the interactive process could not be disputed).
In this case, the vicinage was aware that Tynan believed her disabilities were exacerbated by her conflicts with Pardo and that Tynan wanted the vicinage to remove the "lies out of [her] personnel file", so that if plaintiff wanted to transfer to another County, her file would not reflect her incompetence. The vicinage also knew that Tynan did not want to report to Pardo as her supervisor and that Tynan was told by her doctors that if it were necessary to communicate with Pardo to do so in writing to minimize the resulting stress.
We recognize that the vicinage may have properly rejected both of Tynan's specific accommodation requests. We also recognize that Regan's five-point plan, adopted just before Tynan's leave, together with the grant of Tynan's eleven-month leave may have been reasonable responses to Tynan's initial requests for assistance. The time-frame that we are most concerned with, however, relates to the end of Tynan's leave. It was at that point, that we conclude a factual dispute exists regarding whether the vicinage failed to reasonably accommodate Tynan under the LAD.
The judiciary has an anti-discrimination policy that sets forth in pertinent part, in accordance with the ADA and Civil Rights' regulations, that the judicial branch of government is "committed to complying with the [ADA and LAD] ... and ... will not discharge a worker who develops a disability... so long as that individual remains qualified and able to perform the essential *658 functions of the job with or without reasonable accommodation." We believe that the vicinage may have violated the anti-discrimination policy because without attempting any accommodation, it discharged a handicapped worker.
Tynan was on record preferring to work out her difficulties administratively rather than by filing a complaint. Tynan had sent the vicinage doctor reports periodically throughout her leave period. At the end of her eleven-month leave when Tynan requested an extension, the vicinage knew or should have known of the various maladies Tynan was coping with, her main complaints regarding her work situation, and that she claimed her working conditions had exacerbated her handicap. The vicinage ignored all of this information together with Tynan's leave extension request and simply stuck to its position that a change of supervisor and purging of her personnel file were not accommodations that the vicinage could accept.
Once the vicinage knew of the handicap and Tynan's desire for assistance, the burden was on the vicinage to implement the interactive process. See Taylor, supra, 184 F.3d at 315. If an extension of leave was not possible, then the vicinage had an obligation at that point, considering the information it possessed regarding Tynan's situation, to initiate the interactive process to determine what could be an acceptable accommodation to both sides. Instead, the vicinage ignored Regan's five-point plan, elected not to schedule any meeting with Tynan and in essence decided to orchestrate a termination.
The vicinage did nothing except to treat Tynan's failure to return as a resignation. Given the history of Tynan's situation, the vicinage knew that she could not return to work without some type of accommodation. By failing to initiate the interactive process, and forcing Tynan to return without any accommodation, the vicinage forced the termination.
The vicinage cites to Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3rd Cir. 1998), as directly on point and supportive of its position that it did not have to accommodate Tynan. In that case, plaintiff Gaul's requested accommodation was to be transferred away from co-workers who were causing him prolonged and inordinate stress. The court recognized that Gaul's employer under this accommodation would have to "transfer Gaul to another department whenever he becomes `stressed out' by a coworker or supervisor." Id. at 581. This obligation would be impractical for any employer, and accordingly, the court found the requested accommodation to be "unreasonable as a matter of law." Ibid. As the lower court recognized, "in order to accommodate Gaul, his employer would have to insure that he would be guarded against stress and criticism. Such accommodation is not reasonable, and would impose an undue hardship on the employer." Gaul v. AT & T, 955 F.Supp. 346, 353 (D.C.N.J.1997).
Gaul is distinguishable from Tynan's situation. Tynan had some disability that preceded any difficulties she had with Pardo. Her post-traumatic stress disorder and migraine headaches both preceded Pardo. Tynan's main contention was that Pardo's management style exacerbated her existing disabilities and may have caused others. Gaul, unlike Tynan, could not work under any stress or tension.
While Gaul worked with several supervisors, any tense situation incapacitated *659 Gaul. The only accommodation Gaul requested was a transfer whenever he decided he was stressed. Such an accommodation was unreasonable as a matter of law. Taylor, supra, 184 F.3d at 315, fn. 7. In contrast, Tynan's work record before Pardo became her supervisor was unblemished. Most of the difficulties Pardo had with Tynan appear to be trivial and perhaps personality based. The two employees seem to have had some confusion over their respective roles. Furthermore, the vicinage has stated that if Tynan had requested a transfer to another title, that might have been accommodated. Transfers to a vacant position may in some situations be a reasonable accommodation. Emerson v. Northern States Power Co., 256 F.3d 506, 515 (7th Cir.2001). In addition, if there were no lateral transfers available, the vicinage as another reasonable accommodation could have offered Tynan a job at a lower rank even though it would be considered a demotion. Smith v. Midland Brake, 180 F.3d 1154, 1177 (10th Cir.1999). The record does not reflect whether Tynan would have accepted any transfer because the vicinage did not initiate the interactive process to determine whether a reasonable accommodation was possible.
Moreover, Tynan's last letter to the assignment judge complained of not being advised of a posting of a vacant position in the same vicinage. Thus, Tynan might have been interested in a transfer to another position if this were offered as an option during the interactive process. This vacancy, however, was not explored with Tynan.
Thus, in our opinion, Tynan has raised a factual dispute regarding whether the vicinage acted in bad faith by failing to initiate the interactive process. "[A]n employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations." Taylor, supra, 184 F.3d at 317-18. Tynan's failure to accommodate claim should not have been dismissed on summary judgment and must be determined by a jury.

III.
Tynan's first count in her complaint must therefore be remanded for further proceedings. Accordingly, we briefly review the other counts of Tynan's complaint. Plaintiff alleges that because she was disciplined twice, she suffered a hostile working environment. This allegation does not meet the requirements of Lehmann v. Toys `R' Us, Inc. 132 N.J. 587, 601, 626 A.2d 445 (1993), and was properly dismissed. Similarly, we do not believe that any of plaintiff's contentions are sufficient to raise constitutional or 42 U.S.C.A. § 1983 violations and these counts of her complaint were also properly dismissed. Furthermore, plaintiff failed to brief these contentions and they are therefore deemed waived. Liebling v. Garden State Indemn., 337 N.J.Super. 447, 465-66, 767 A.2d 515 (App.Div.2001).
With regard to Tynan's contention that defendants intentionally inflicted emotional distress, the trial judge has made no findings of fact or conclusions regarding this allegation. While we have some doubt as to whether the claim raises sufficiently outrageous conduct to withstand scrutiny under Buckley v. Trenton Sav. Fund Soc., 111 N.J. 355, 366, 544 A.2d 857 (1988), we do not exercise our original jurisdiction to resolve this matter. Instead, we leave this count for the trial judge to handle on the remand.

*660 IV.
Because there will be a remand in this matter, we also consider the trial court's exclusion of plaintiff's expert reports. Tynan served on defendants copies of reports from Dr. Howard B. Jones, M.D., Susan M. Bauman, M.D., Howard Layman, M.D., Joseph O. D'Arco, MPA, and Dr. James J. Carroll, CPA. Defendants argue that Tynan failed to submit these reports within the time prescribed by the rules and that the reports failed to set forth any rationale for the conclusions noted.
The trial court entered a November 5, 2000, order barring any expert testimony based on these reports. Except for the language contained in the order, nothing indicates what inquiries the court conducted before barring the experts' testimony and report. It is not clear whether the trial court considered the reports "net opinion" or otherwise defective. In short, there are no findings of fact and conclusions of law on this point. We cannot determine whether the trial court abused its discretion.
Moreover, "the sins or faults of an errant attorney should not be visited upon his client." Wilkins v. Hudson County Jail, 217 N.J.Super. 39, 41, 524 A.2d 1274 (App.Div.), certif. denied, 109 N.J. 520, 537 A.2d 1304 (1987) (quoting Jansson v. Fairleigh Dickinson University, 198 N.J.Super. 190, 194, 486 A.2d 920 (App.Div.1985)). We have been reluctant to impose the sanction of testimonial exclusion where a litigant's attorney has failed to comply fully with the discovery rules. Wilkins, supra, 217 N.J.Super. at 41-2, 524 A.2d 1274; Maurio v. Mereck Construction Co., Inc., 162 N.J.Super. 566, 570, 394 A.2d 110 (App.Div.1978). This reluctance is particularly appropriate in this case where the record reflects that Tynan played no role in any of the alleged discovery defects. Accordingly, we reverse the exclusion and suggest to the trial court that if it determines that Tynan's counsel has abused the discovery process, any sanction imposed should be tailored to the abuse.
In addition, we do not decide whether any particular report or the corresponding trial testimony might be appropriately rejected on some other legitimate basis. We note for example, that defendants assert that D'Arco's report is not the proper subject of expert testimony. Moreover, the body of the order reflects that Dr. Layman was the State's expert and not Tynan's, but the handwritten explanation regarding Dr. Layman at the bottom of the order was not completely reproduced in the appendix. Accordingly, we leave to the trial court whether to exclude the report or testimony of any particular expert in this matter.
In conclusion, we affirm the summary judgment dismissing counts three, four, five and six. We reverse the summary judgment dismissing counts one and two of plaintiff's complaint and remand for further proceedings not inconsistent with this decision.
Affirmed in part, reversed and remanded in part.