**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1880-17T3

S.S.,

     Complainant-Appellant,

v.

CHERRY HILL PUBLIC
SCHOOLS,

     Respondent-Respondent.

_____

          Argued January 29, 2019 – Decided March 11, 2019

          Before Judges Suter and Firko.

          On appeal from the New Jersey Division on Civil Rights, Docket No. ED12HE-63555.

          Joel Wayne Garber argued the cause for appellant (Garber Law, PC, attorneys; Joel Wayne Garber, on the brief).

          Eric L. Harrison argued the cause for respondent Cherry Hill Public Schools (Methfessel & Werbel, attorneys; Jennifer M. Herrmann, of counsel and on the brief; Ashley E. Malandre, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Division on Civil Rights (Jason W. Rockwell, Assistant Attorney General, of counsel; Megan J. Harris, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Complainant S.S.[1] appeals the finding by the New Jersey Division on Civil Rights (DCR) that there was no probable cause justifying her complaint that respondent Cherry Hill Public Schools discriminated against her based on her physical disabilities by denying her a reasonable accommodation. We agree that DCR's finding was not arbitrary, capricious or unreasonable and was supported by substantial credible evidence in the record.

I

S.S. was employed by respondent as an art teacher, when between 2008 and 2011, she injured her knee, shoulder and back in work related incidents, qualifying her for workers' compensation benefits. When she was assigned during the 2011-2012 school year to teach at two separate elementary schools, she asked for certain accommodations: a classroom aide to assist her; an adult chair located at each art table; and classroom teachers to deliver and pick up her

---

[1] We have used initials for privacy purposes given the discussion herein of her physical disabilities.

students. She advised respondent she could not stand for more than ten minutes, carry more than ten pounds or reach over her head with her arms. Respondent met with her to discuss reasonable accommodations, and then provided part-time classroom aides to assist her. Halfway through that school year, and at her request, S.S. was transferred to teach art at the high school level, where she previously had been assigned. She taught classes daily at both Cherry Hill East and Cherry Hill West high schools for the rest of that school year. The schedule allowed her forty-two minutes to drive seven miles between the schools, followed by a forty-two minute lunch period.

For the 2012-2013 school year, respondent implemented a "modified block scheduling format" for the high schools that included longer classes that met less often per week. S.S. was assigned to teach at both high schools, but the schedule now allowed only twenty-five minutes to travel between the schools, followed by a twenty-five minute lunch period. That gave her sixty-two minutes to travel and eat her lunch instead of the previous ninety-six. She also had a free period two or three times per week prior to her travel period. Another art teacher had the same schedule; when S.S. was at Cherry Hill East, the other teacher was at Cherry Hill West and then vice-versa.

In July, before this schedule commenced, S.S. emailed the Human Resources director asking that she and the other art teacher be assigned to teach at only one high school. She gave a number of reasons for this, but none had to do with her physical disabilities or with any need for an accommodation. A month later she communicated the same reasons to the principal of one of the high schools, again without mentioning the need to accommodate her physical handicaps. When later questioned by the DCR investigator about this, she explained she wanted to address "professional and not personal issues relating to the new changes" and that respondent already knew about her knee-related disability. Respondent advised S.S. the schedule was set already and would remain "intact for the upcoming school year."

S.S. commenced the 2012-2013 school year under the new schedule, but complained that the commute time was inadequate, requiring her to use part of her lunch period for travel. In October, the district's education association president contacted respondent about updating S.S.'s Section 504 accommodation plan,[2] and a meeting was held within that month. S.S. provided a doctor's note asking respondent to make reasonable accommodations due to

---

[2] Pub. L. 93-112, Title V, § 504, Sept. 26, 1973, 87 Stat. 394 (codified as amended at 29 U.S.C. § 794).

S.S.'s "chronic knee arthropathy and recurrent [carpal] tunnel syndrome." These included: duty assignments in close proximity to her classroom because she could not walk long distances or climb stairs; a handicapped parking space near her classrooms at both high schools; no "stressful repetitive tasks" such as filing or sorting because of carpal tunnel syndrome; and continued implementation of earlier accommodations against "lifting of heavy objects, bending, stooping, stretching and reaching." Her doctor did not say S.S. could not travel between schools but his note did provide: "[S.S.] has to rush between high schools in roughly [twenty-five] minutes. This year's greatly reduced travel time is creating excess stress upon her knee arthropathy, which is unnecessarily exacerbating her condition. Please formulate a plan to reasonably accommodate this issue . . . ."

S.S. presented a "504 Reasonable Accommodation" chart at the meeting listing her disabilities and requested accommodations: she wanted to be assigned to one high school, not two; not to have to walk long distances; a key for the elevator; handicapped parking; a key to one of the secure doors at Cherry Hill West or for security to leave that door unlocked for fifteen minutes; and extended time to travel. Respondent developed a "[S]ection 504 staff accommodation plan" for the 2012-2013 school year that S.S. would not sign

because she complained it did not address the travel issue between the high schools. It included three accommodations for her "chronic knee arthropathy and recurrent carpal tunnel syndrome":

> 1. There will be a staff member available to open the side doors for [S.S.] when she arrives at the second school building. This will give her closer access to handicapped parking.
>
> 2. [S.S.] is unable to lift objects over [ten] lbs.
>
> 3. [S.S.] will be provided elevator access.

Similar to other teachers who taught in two facilities, S.S. was relieved of her duty assignments, which gave her two or three free periods per week prior to her twenty-five minute travel time, followed by a twenty-five minute lunch period.

S.S. alleged there were problems with implementation of the plan. There was not someone at the locked side door to open it for her. She complained about not being issued a key for that door when two IT staff members had been issued keys. She requested to be assigned to one high school. She reportedly was using part of her lunch time for the commute.

In January 2013, petitioner filed a complaint with the DCR alleging that respondent failed to accommodate her disabilities. She also sent a letter to respondent the next day explaining her difficulties in detail and asking to be assigned to one high school. She attached a doctor's note that said she had

6

"developed serious gastrointestinal symptoms as a direct result of greatly reduced travel and lunch times on her job. Kindly formulate appropriate accommodations." Following up on Human Resources' timely inquiry, the principal of Cherry Hill West responded that no other teacher had a key to the side door and that S.S.'s 504 plan had been put in place promptly. Although the principal apparently believed that S.S. and another teacher would change students at the end of the semester, he explained that having two teachers teach art was beneficial for the students. Shortly after this, S.S. was advised she would be assigned to one high school in the 2013-2014 school year.

The DCR investigated the complaint and although an investigator wrote to petitioner in July 2016 that the investigation was nearing conclusion, a new investigator was assigned and he conducted additional interviews and gathered more information. Mediation was unsuccessful.

The DCR issued its decision on November 17, 2017, finding no probable cause justifying S.S.'s complaint. The DCR noted that because S.S. and another art teacher "essentially had parallel schedules," respondent could have granted S.S.'s request to switch schools "without making significant changes to the schedule mid-year." However, respondent argued that administrators developed the class schedules "considering the individual skills, areas of expertise and

A-1880-17T3

capabilities of each instructor as well as the classes being offered in the upcoming school year" and that because of this, it was "usually unable to re-staff teachers at the mid-year break."

In concluding there was no probable cause, the DCR found senior school officials met with S.S. in a reasonably prompt manner on more than one occasion to discuss her request for accommodations and granted a number of her requests. The DCR found respondent "engaged in a good faith interactive process and provided accommodations to assist [S.S.] in performing her duties." Although respondent could have been more "communicative," it did not show a lack of good faith. The DCR reported that its investigators were able to travel between the schools in twelve to fifteen minutes. That S.S. did not receive all the accommodations she requested was not the legal standard. Respondent assigned her to one school in the 2013-2014 school year. It found that "in the specific context of this case . . . the evidence [did] not support the conclusion that the sequence and timing of the accommodations respondent provided failed to reasonably accommodate [S.S.'s] disability." The DCR concluded that its investigation did not find sufficient evidence to indicate that respondent violated the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. There also was no evidence of "discriminatory animus."

On appeal, S.S. contends the DCR decision should be reversed because it was not supported by the evidence. She argues that she did not receive a reasonable accommodation because the solutions provided did not work. None of the steps taken actually remedied the problems caused by the split school assignment with the shorted commute times. She argues the accommodations were not consistently provided nor did respondent engage in a good faith interactive process. S.S. contends that additional fact-finding is needed to resolve inconsistencies in DCR's no probable cause finding.

## II

The scope of our review in an appeal from a final decision of an administrative agency is limited. Russo v. Bd. of Trs., PFRS, 206 N.J. 14, 27 (2011) (citing In re Herrmann, 192 N.J. 19, 27 (2007)). The agency's decision should be upheld unless there is a "clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Ibid. (quoting Herrmann, 192 N.J. at 27-28). The burden of demonstrating the agency's action was arbitrary, capricious or unreasonable rests upon the party challenging the administrative action. See In re Stream Encroachment Permit, 402 N.J. Super. 587, 597 (App. Div. 2018). We are not bound by the "agency's interpretation of

a statute or its determination of a strictly legal issue." Russo, 206 N.J. at 27 (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).

The LAD prohibits an employer from discriminating based on an individual's disability. Victor v. State, 203 N.J. 383, 410 (2010). "It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: (a) for an employer, because of . . . disability . . . to discriminate against such individual . . . in terms, conditions or privileges of employment . . . ." N.J.S.A. 10:5-12(a). The LAD prohibits unlawful discrimination against any person who is or has been disabled "unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J.S.A. 10:5-4.1. An employer is required to "reasonably accommodate an employee's handicap." Royster v. N.J. State Police, 227 N.J. 482, 499 (2017); see Victor, 203 N.J. at 423. The burden is on the employee to put the employer on notice as to the need for an accommodation. See, e.g. id. at 414.

Reasonable accommodation "refers to the duty of an employer to attempt to accommodate the physical disability of the employee, not to a duty on the part of the employer to acquiesce to the disabled employee's requests for certain benefits or remuneration." Id. at 423 (quoting Raspa v. Office of Sheriff of City of Gloucester, 191 N.J. 323, 339 (2007)). "If an employer reasonably

determines that an employee because of handicap cannot presently perform the job even with an accommodation, then the employer need not attempt reasonable accommodation." Tynan v. Vicinage 13 of Superior Ct., 351 N.J. Super. 385, 397 (App. Div. 2002).

Under the LAD, a disability discrimination claim requires proof by the employee that she:

> (1) qualifies as an individual with a disability, or . . . is perceived as having a disability, as . . . has been defined by statute;
>
> (2) is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without reasonable accommodations; and
>
> (3) that defendant failed to reasonably accommodate [her] disabilities.
>
> [Royster, 227 N.J. at 500 (quoting Victor, 203 N.J. at 410).]

Whether an employer has made a reasonable accommodation is evaluated on a "case-by-case basis." N.J.A.C. 13:13-2.5(b). The employer has the discretion to choose between "effective accommodations" and "may choose the less expensive accommodation or the accommodation that is easier for it to provide." Victor, 203 N.J. at 424 (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136-37 (8th Cir. 1999)).

11

Once an employee makes clear that she is requesting a reasonable accommodation for her disability, "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Tynan, 351 N.J. Super. at 400 (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 312 (3d Cir. 1999)). Employers must make a "good faith effort" to engage in an interactive accommodation process and to determine what appropriate accommodations may be necessary. Victor, 203 N.J. at 424. Where an employee alleges the employer failed to engage in the interactive process, she must show that:

> 1) the employer knew about the employee's disability;
>
> 2) the employee requested accommodations or assistance for his or her disability;
>
> 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and
>
> 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.
>
> [Tynan, 351 N.J. Super. at 400-01 (citing Taylor, 184 F.3d at 319-20).]

Petitioner filed a complaint with the DCR claiming that respondent did not provide her with reasonable accommodations to address her disabilities.

When a complaint is filed, the DCR director is required to determine, after an appropriate investigation of the claims, whether "probable cause exists to credit the allegations of the verified complaint." N.J.A.C. 13:4-10.2(a). Probable cause exists if "based upon a review of the investigative findings . . . there is a reasonable ground of suspicion supported by facts and circumstances strong enough in themselves to warrant a cautious person in the belief that the [LAD] . . . has been violated . . . ." N.J.A.C. 13:4-10.2(b). Without probable cause, the DCR will issue a final agency order closing the case. N.J.A.C. 13:4-10.2(e); R. 2:2-3(a)(2). It is against this framework that we evaluate the DCR's finding of no probable cause.

We agree with the DCR there was substantial evidence in the record to show that respondent engaged in good faith with S.S. in an interactive process to address reasonable accommodations for her disabilities. Respondent acknowledged in its answer to the DCR complaint that S.S. was a person with a disability. She requested accommodations for the 2011-2012 and 2012-2013 school years. Respondent met with her promptly on more than one occasion to discuss her 504 plans and to consider her requests. It granted many of these requests including: a handicapped parking space; a part-time aide when she was assigned to teach in elementary school; a transfer from teaching elementary

school classes to teaching high school classes; allowing her to use a secured door for entry that was closer to her handicapped parking spot; assigning a person to open that door for her; not requiring her to lift any objects over ten pounds; elevator access; and notifying her in advance that, effective for the 2013-2014 school year, she would be assigned to one high school. Because she was required to travel between the two schools, she and other teachers were relieved of duty assignments, which gave her an additional free period two or three days per week.

Respondent did not grant her request to transfer to a single high school. She does not contend the issue was not discussed or considered by respondent; only that it was not granted. The fact that a request for accommodation is not granted, does not establish the absence of a good faith interactive process. See Victor, 203 N.J. at 424 (citing Taylor, 184 F.3d at 317). Respondent rejected the mid-year transfer because, as explained by the principal, "it would interfere with the administration's ability to assign teaching staff members to positions and school buildings based upon the District's educational needs and student enrollment." He explained to the DCR that staff assignment decisions were "complicated" and "typically occur[ed] in the spring prior to each school year." The teaching schedules were developed "by considering the individual skills,

areas of expertise and capabilities of each instructor as well as the classes being offered in the upcoming school year" and "because those decisions require a balancing of many factors, the District [was] usually unable to re-staff teachers at the mid-year break." Petitioner never refuted this.

That the principal was mistaken about the fact that petitioner and another art teacher were not making a switch in their classes at the end of the semester did not prove lack of good faith. See Fuentes v. Perskie, 32 F.3d 759 (3d. Cir. 1994) (a "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent"). S.S. did not provide any proof this was anything other than a non-pretextual error. Respondent implemented new scheduling throughout the district; the fact it could transfer her mid-term the year earlier did not mean the same could apply the next.

As cited by S.S., Taylor supports the DCR's finding that respondent showed good faith in the interactive process: it met with S.S.; considered information she presented about her disabilities and her limitations; reviewed her chart that listed her accommodation requests; considered these and discussed and implemented alternatives to address her disabilities. 184 F.3d at 317.

15

We also agree with the DCR there was substantial evidence in the record that respondent made reasonable accommodations for S.S.'s disabilities. S.S. argues that respondent would not transfer her to a single high school even though she said the requested change was "uncomplicated, easily achievable and had been previously granted." However, the employer has the discretion to choose which accommodations to give, so long as the accommodations are effective in permitting the employee to perform her essential job functions. Victor, 203 N.J. at 424 (quoting Kiel, 169 F.3d at 1136-37).

We see no reason why respondent could not have chosen to try to shorten the walking distance for S.S. by allowing her to enter via a side door, which was nearest to her handicapped parking spot, rather than change the schedule that affected other teachers and students. Respondent certainly could consider the security of the students and staff by limiting the keys issued for the side door and by keeping the door locked. No teachers were issued a key to that door. Apparently, there was not always a person there to open the door for S.S. Respondent then assigned someone. That person suggested to S.S.—what seemed obvious—that she call ahead so he could be there. Sometimes that arrangement did not work out; at other times the commute cut into her lunch period. She acknowledged to the DCR, however, that once the school schedule

was set, it was not workable to change the schedule mid-year to give her more time to travel between the schools. Fairly early in 2014, S.S. was advised that in the 2014-2015 school year, she would be assigned to one high school. Respondent had operational reasons for not transferring her mid-term that she really did not refute. Her other requests for accommodation were implemented. On this record, the DCR's decision that petitioner was accorded reasonable accommodation was not arbitrary, capricious or unreasonable.

There is no reason to remand the case to the DCR so that it can "investigate contradictory evidence" and "resolve discrepancies" with that evidence. The issues raised by S.S. were reasonably explained. No other teachers had a key to the secured door; the commute was seven miles between schools; respondent explained why it did not transfer her mid-term.

After carefully reviewing the record and the applicable legal principles, we conclude that S.S.'s further arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1880-17T3