4 A.3d 126

ROY M. VICTOR, PLAINTIFF–APPELLANT, v. STATE OF NEW JERSEY, NEW JERSEY STATE POLICE, SGT. ERIC ESTOK, DR. DONALD IZZI, CAPT. SALVATORE MAGGIO, AND LT. PAUL WAGNER, DEFENDANTS–RESPONDENTS.

Argued October 27, 2009—Decided September 13, 2010.

386

*Eldridge Hawkins* argued the cause for appellant.

*Vincent J. Rizzo, Jr.,* Deputy Attorney General, argued the cause for respondents (*Anne Milgram,* Attorney of New Jersey, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel).

*Glen D. Savits* submitted a brief on behalf of amicus curiae AARP (*Green Savits & Lenzo,* attorneys; *Mr. Savits* and *Daniel B. Kohrman,* a member of the District of Columbia bar, of counsel and on the brief).

*Andrew Dwyer* submitted a brief on behalf of amicus curiae National Employment Lawyers Association of New Jersey (*The Dwyer Law Firm,* attorneys).

Justice HOENS delivered the opinion of the Court.

In this appeal the Court is asked to consider whether an adverse employment consequence is an essential element of a plaintiff's claim that his employer discriminated against him by failing to accommodate his disability. The trial court concluded that the failure to accommodate was itself an adverse employment consequence, as a result of which plaintiff was only required to prove, as part of his prima facie case, that the employer failed to offer him a reasonable accommodation. The Appellate Division disagreed, reasoning that an adverse employment consequence is

an essential element of all disability-based employment discrimination claims and concluding that plaintiff could not succeed on his failure to accommodate claim because he did not suffer any adverse employment consequence.

The question raised in this appeal, therefore, has been narrowly phrased in terms of whether there can be a "freestanding" failure to accommodate claim, that is, a claim based on a failure to accommodate a disability that does not result in any adverse employment consequence. Attempting to answer that question requires an understanding of the way in which protections for persons with disabilities have evolved through numerous state and federal statutes and their implementing regulations. Part and parcel of that understanding is an appreciation for the way in which the goals embodied in those statutes have been advanced by the protections that reasonable accommodations can and do afford persons with disabilities in the workplace. In the end, we conclude that plaintiff's failure to accommodate claim cannot succeed, but in doing so, we leave for another day a definitive answer to the question he sought to have resolved in this appeal.

I.

Plaintiff Roy Victor, who is employed as a New Jersey State Trooper, sued defendants State of New Jersey, New Jersey State Police, and a group of separately-named individuals who were either his supervisors or medical personnel employed by the State Police, asserting discrimination claims based on race and disability pursuant to the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -49. Plaintiff's specific allegations,[1] which spanned the time period from 1995 through July 2004, included

---

[1] The amended complaint also included counts based on breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress, violation of the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19-1 to -8, and deprivation of numerous rights guaranteed by the New Jersey Constitution. Those counts in the complaint were either voluntarily withdrawn or dismissed prior to trial and have not been the subject of any appeal.

claims of failure to promote, disparate treatment, hostile work environment, and retaliation, all based on race and disability, as well as a claim that defendants failed to accommodate plaintiff when he sustained a back injury.

We need not recite in detail the factual assertions that were the subject of plaintiff's proofs at trial because they are fully set forth in the published decision of the Appellate Division, *see Victor v. State*, 401 *N.J.Super.* 596, 602–05, 952 *A.*2d 493 (App.Div.2008), and because the issue before this Court rests on events that occurred on a single day during plaintiff's employment. For those reasons, except to the extent that a fuller factual explanation is required, we focus our recitation of the facts on the events of that day.

Plaintiff began his career with defendant New Jersey State Police in 1986 and served uneventfully until he sustained a back injury while on duty in 1995. From then until late 2003, that injury, together with a stress-related disorder that plaintiff attributed to a racially-discriminatory job site transfer in 1998, resulted in lengthy periods of time during which plaintiff was on medical leave, was off-duty, or was on limited-duty status.

The undisputed evidence in the record demonstrates that there are regulations governing how and under what circumstances a trooper is eligible to be classified as off-duty or limited-duty, and the manner in which a trooper is returned to full-duty status. In summary, a trooper who is injured while on full duty is entitled to sick leave, which a trooper can access simply by calling his or her assigned station and informing a supervisor. After taking an initial period of three sick days, the trooper is required to be examined by a division doctor and to produce medical documentation supporting the claimed injury or illness. In addition, the trooper is required to be seen by the same division doctor until the injury or illness is resolved and only the division doctor is authorized to change a trooper's duty status. A trooper who is on medical leave, or who is placed on off-duty or limited-duty status, receives full pay and benefits, and there is no pre-determined limit

on the number of days that a trooper may be on leave or in a status other than full-duty. Prior to the date that is the focus of this appeal, plaintiff complied with all of the regulations concerning his status and throughout his lengthy periods of medical leave, off-duty status, and limited-duty status, he received his full pay and benefits and he was awarded regularly-scheduled longevity promotions in rank.

At all times relevant to this appeal, plaintiff was a Trooper I, for whom full-duty status meant that the trooper was deemed able to perform all of the physical and other duties of that position, including being on road patrol and wearing a protective vest. Throughout plaintiff's medical and stress-related periods of leave, he was seen regularly by defendant Dr. Donald Izzi, who was the Director of Medical Services for the New Jersey State Police. Dr. Izzi supervised the regional division doctors and essentially acted as plaintiff's division doctor during the times that are relevant to this dispute.

After several extended time periods during which plaintiff was in off-duty status because of his back injury or because of a recurrence of his stress disorder, plaintiff returned to work in April 2003, at which time he was approved to be on limited-duty work status. He remained in that status until December 8, 2003, at which time he successfully completed a functional capacity test, was cleared medically by a worker's compensation doctor and a division physician, and was returned to full-duty status by Dr. Izzi. He used December 10, 2003, as an approved holiday and reported for duty on December 11, 2003.

When plaintiff reported for duty that day, he told the Assistant Station Commander, Sergeant O'Rourke, that he had injured his back at some point in time between December 8, when he was cleared for full-duty service, and December 10, the day before he reported. Although he said that he was injured, he had not called in and asked for medical leave, he had not consulted a personal physician, and he had not attempted to contact Dr. Izzi or any other Division medical personnel about a change in his duty

status. Instead, he told Sgt. O'Rourke that he wanted to perform administrative tasks in the station rather than go out on road patrol, because he thought that wearing the protective vest required of all full-duty officers while on road patrol would exacerbate his back injury. Although Sgt. O'Rourke had no authority to alter any trooper's duty status, he was willing to agree to plaintiff's request.

Lieutenant Warren Shakespeare, the Station Commander, was the only officer authorized to alter a trooper's duty status. When he arrived, he spoke with Dr. Izzi and confirmed that plaintiff had been cleared for full duty and had not sought medical authorization for a change in duty status. Shakespeare then told plaintiff that he could not remain at the station and directed plaintiff to perform the work of a full-duty road trooper by reporting for road patrol duty. In response, plaintiff did not request sick leave, ask that he be permitted to visit the division doctor, or produce anything to document his claim that he was injured, but instead put on his protective vest and went out on road patrol. He stayed out on road patrol for four of the six hours that remained of his shift. At that point, he returned to the station and took sick leave for the final two hours of his shift and for each of the following three days when he would otherwise have been required to report for full duty.

At the end of that period of time, plaintiff was seen by two different division physicians and was subsequently placed on off-duty status based on a complaint relating to his pre-existing depression and stress disorder that was supported by a report from his treating psychologist. There is no evidence in the record that plaintiff ever produced any documentation to support his claim that he suffered from a back injury on the disputed day in December.

## II.

Although plaintiff's disability discrimination complaints are intertwined to some extent with his racial discrimination complaints,

and although his disability complaint has components relating to his psychological and physical disorders, his failure to accommodate claim is narrowly focused. That claim for relief relates only to the four-hour period of time on December 11, 2003, when plaintiff was ordered to return to full duty as a road trooper after telling his supervisor that he had injured his back on one of the immediately preceding days. It is therefore against that limited factual background that we must consider plaintiff's failure to accommodate claim.

The parties' arguments about whether an adverse employment consequence is one of the required elements of a failure to accommodate claim were raised before the trial court both during the charge conference and in a post-verdict motion for a new trial. When defendants requested a charge that included adverse employment consequence as an element of plaintiff's proofs, the trial court refused, commenting,

> [Plaintiff] says he sustained psychological injury as a result of the treatment of him when he came back on December 11th and they refused to accommodate his handicap by allowing him to stay in the station.

> So he's claiming that he was injured as a result of the ... failure to accommodate his handicap. So that, to me, I mean, I don't need to get into an adverse employment action. He has to prove his damages.

In essence, the trial court reasoned that an adverse employment consequence was merely the means through which plaintiff proved employment discrimination damages, with the result that if plaintiff could prove some other form of damages, it became unnecessary. When defendants reiterated their charge request after closing arguments, the trial court again refused, continuing to treat adverse consequence as a form of damages, and explaining that

> usually the failure to accommodate comes up in the context of terminations or transfers, demotions and that sort of thing. But as I explained on the record yesterday, the claim here is that he suffered psychological injury by the failure to accommodate him and the stress that was attendant with that day on December 11th and to me that was sufficient under the circumstances.

In charging the jury, the trial court explained the failure to accommodate in terms of a failure to engage in an interactive process to accommodate, instructing as follows:

When an employee seeks an accommodation for a disability, the employer is required to engage in an interactive process as part of a good faith effort to identify the precise limitations resulting from a disability and potential reasonable accommodations that could overcome those limitations. A failure to accommodate is demonstrated when the employer fails to engage in this interactive process in good faith.

Moreover, when a disabled employee requests an accommodation and the employer contends that the accommodation would impose an undue hardship on the employer's business, the employer has the burden of proving that the requested accommodation would constitute an undue burden on the employer's business.

As a result, the jury instructions [2] did not include any reference to adverse employment consequence as an element of plaintiff's proofs. Instead, the court charged the jury that plaintiff only needed to prove that he was disabled on December 11, 2003; that defendants knew about his disability; that he requested an accommodation; that defendants did not make a good faith effort to accommodate him; and that he "could have been reasonably accommodated but for the lack of [defendant's] good faith."

The jury returned a split verdict, rejecting all of plaintiff's race-based discrimination claims, all of his claims that he was subjected to a hostile work environment because of his race or his disabilities, his claim that he was treated disparately in ranking or promotions because of his disabilities, and all of his claims that were directed to any of the individual defendants.

At the same time, however, the jury found for plaintiff on his claims that defendant State Police had discriminated against him based on his disabilities through disparate treatment (other than in rankings and promotions), by retaliating against him because of complaints he filed with the Equal Employment Opportunity office of the State Police, and by failing to accommodate him on Decem-

---

[2] Additional portions of the charge relating to the failure to accommodate claim are recited in the published opinion of the Appellate Division. *See Victor, supra,* 401 *N.J.Super.* at 608, 952 A.2d 493.

ber 11, 2003, when he was sent out on the road. Because the jury had rejected plaintiff's claims relating to rankings and promotion, it made no back pay or front pay award, but it awarded plaintiff a single lump sum of $65,000 as damages for all of the claims on which he had succeeded. Following a bifurcated trial immediately after the compensatory verdict was announced, the jury awarded plaintiff $250,000 in punitive damages as well.

Defendants moved for a new trial or for judgment notwithstanding the verdict, again raising, among other things, their argument about the required elements of a failure to accommodate claim. In denying that relief, the trial court crystallized its essential holding:

> I believe that the jury charge was correct and it's consistent with New Jersey law. In my view ... if you prove failure to accommodate, that failure is in and of itself an adverse employment action. I mean the case law doesn't say that specifically but to me that's implicit in the failure to accommodate charge.
>
> If you don't accommodate someone, that is an adverse action to them if they can prove all the elements of failure to accommodate.

Defendants appealed, arguing that the jury charge was flawed because it omitted adverse employment consequence as an element of a failure to accommodate claim. The Appellate Division, in a published opinion, recognized that the issue is a novel one, commenting that it was "at a loss to locate a state court decision addressing whether plaintiff must prove an adverse employment action occurred as a result of a failure to accommodate a claimed disability." *Id.* at 611, 952 *A*.2d 493. Concluding, however, that proof of an adverse employment action is a required element of a failure to accommodate claim under the LAD, *id.* at 617, 952 *A*.2d 493, the Appellate Division rejected the trial court's reasoning that an adverse employment consequence "is presumed by the failure to accommodate or that plaintiff's claimed psychological suffering unequivocally qualifies." *Ibid.* Having concluded that the jury charge was in error, the panel remanded for a new trial on all claims, noting that the jury's lump sum award of damages could not be appropriately molded. *Ibid.*

Plaintiff's petition for certification was granted, but was limited to one issue: "whether a plaintiff must prove he suffered an adverse employment action as a result of his employer's failure to accommodate a physical disability under the Law Against Discrimination, *N.J.S.A.* 10:5–1 to –49." *Victor v. State,* 199 *N.J.* 542, 973 *A.*2d 946 (2009).

### III.

Plaintiff urges this Court to reverse the judgment of the Appellate Division and to reinstate the jury verdict in his favor, arguing that the panel erred in two ways. First, plaintiff asserts that its decision conflicts with federal court precedents construing disability discrimination claims brought pursuant to the Americans with Disabilities Act (ADA), 42 *U.S.C.A.* §§ 12101 to 12213. More particularly, he contends that it is contrary to a decision in which the United States Court of Appeals for the Third Circuit construed the ADA to mean that a plaintiff in a failure to accommodate case need not demonstrate an adverse employment impact because the failure to accommodate is itself the adverse employment consequence. *See Williams v. Phila. Hous. Auth. Police Dep't,* 380 *F.*3d 751, 761 (3d Cir.2004) ("Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities."), *cert. denied,* 544 *U.S.* 961, 125 *S.Ct.* 1725, 161 *L.Ed.*2d 602 (2005). He urges this Court to do likewise in interpreting the LAD.

Second, plaintiff asserts that the appellate panel erred by overlooking relevant administrative regulations promulgated in New Jersey pursuant to the LAD. He argues that the Appellate Division did not fully consider, and failed to correctly apply, the New Jersey regulation, *see N.J.A.C.* 13:13–2.5(b), that is a corollary to the ADA's reasonable accommodation protection for disabled persons, *see* 42 *U.S.C.A.* § 12112(b)(5)(A). He argues that the Appellate Division should have considered this regulation to be persuasive and urges this Court to correct its erroneous interpretation.

Defendants assert that because plaintiff suffered no change in rank, no loss of pay or benefits, and no other adverse employment consequence, he cannot demonstrate one of the required elements for a failure to accommodate claim and cannot recover. Moreover, they argue that the Appellate Division correctly applied all of the relevant New Jersey and federal precedents and that plaintiff's reliance on *Williams* is misplaced. They contend that because the plaintiff in *Williams* was terminated, she did suffer an adverse employment consequence and that the Third Circuit did not directly consider or decide whether her claim could have succeeded without that element of her proofs. Therefore, they argue that anything in the *Williams* opinion that might be read to support plaintiff's position is dicta that does not bind and should not persuade this Court.

Echoing plaintiff's assertions in their separately submitted briefs, amici curiae National Employment Lawyers Association of New Jersey and AARP offer similar arguments in support of a reversal of the Appellate Division's judgment. They assert that the Third Circuit, in *Williams,* equated the failure to make a reasonable accommodation with an adverse employment action, and they urge this Court to find that reasoning to be persuasive. In addition, they contend that the Court should look to the LAD's interpretative regulation, *N.J.A.C.* 13:13–2.5(b), to find support for the conclusion that an adverse employment consequence is not part of plaintiff's required proofs. Finally, amici urge this Court to reject the judgment of the Appellate Division as being in conflict with the essential purposes of the LAD.

## IV.

The parties and amici in this matter call upon us to identify the elements of the prima facie case for a claim sounding in failure to accommodate pursuant to the LAD and, more specifically, to address whether proof of an adverse employment consequence is essential to that cause of action. In responding to that question, the trial court and the Appellate Division relied on similar prece-

dents, but reached contrary conclusions. We begin, therefore, with an explanation of some of the fundamental tenets that inform our analytical approach.

■ It is a frequent observation that we rely on the federal courts and their construction of federal laws for guidance in those circumstances in which our LAD is unclear. *See Bergen Commercial Bank v. Sisler,* 157 *N.J.* 188, 200, 723 *A.2d* 944 (1999) ("To the extent the federal standards are 'useful and fair,' they will be applied in the interest of achieving a degree of uniformity in the discrimination laws.") (quotation omitted); *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 606–07, 626 *A.2d* 445 (1993) (referring to United States Supreme Court's interpretation of Title VII in considering elements of hostile work environment claim); *Grigoletti v. Ortho Pharm. Corp.,* 118 *N.J.* 89, 97, 570 *A.2d* 903 (1990) ("In a variety of contexts involving allegations of unlawful discrimination, this Court has looked to federal law as a key source of interpretive authority.").

That general observation, however, cannot substitute for understanding the ways in which the long and rich history of our LAD and its interpreting regulations have repeatedly intersected with those federal laws and their related regulations. It is particularly true that understanding the Legislature's intent as expressed in our LAD's provisions relating to persons with disabilities requires an appreciation of its evolution in the context of the historical development of corollary rights on the federal level.

Our examination need not trace the history of the LAD as far back as its origin in 1945, because references of any kind[3] to handicaps or disabilities are of far more recent vintage. Protections for the handicapped were first added to the LAD in 1972.

---

[3] The earliest references to people with disabilities used the term handicapped. Court decisions both at the state and federal level, depending on the particular statute being considered, have used both terms, sometimes interchangeably. We will not endeavor to replace one term for the other but will remain faithful to the language utilized in each statute or court decision to the greatest extent possible.

*See L.* 1972, *c.* 114 (eff. Aug. 1, 1972). That enactment created an entirely new subsection to the LAD and generally extended the statute's reach, *id.* at § 2 (creating *N.J.S.A.* 10:5–4.1), but only applied to persons with a physical handicap, *id.* at § 1(q) (adding definition of physical handicap). Moreover, the new statutory language limited the LAD's protections for the handicapped somewhat by including an exception for circumstances in which "the nature and extent of the handicap reasonably precludes the performance of the particular employment." *Id.* at § 2. The Committee Statement that accompanied the bill simply expressed an intention to address the failure of existing law to prohibit discrimination against physically handicapped people. *See* Senate Judiciary Committee, *Statement to Senate Bill No. 486,* (Mar. 23, 1972). It therefore does not explain why the Legislature chose not to add persons with disabilities as a protected class, but created a separate statutory section for their protection instead. Presumably, however, the new provision's exception for a handicap that "reasonably precludes" performance reflects the recognition that, unlike other protected classes, a person's physical disability might interfere with full and unfettered equal treatment.

Shortly thereafter, Congress enacted the Rehabilitation Act of 1973, 29 *U.S.C.A.* §§ 701 to 796*l,* which has been the essential wellspring for the rights granted to persons with disabilities ever since. Although the Rehabilitation Act was limited in scope to employers operating as federal contractors and recipients of federal funding, the impact of two of its provisions, known as Sections 503 and 504, *see id.* at §§ 793, 794, has been far-reaching. Section 503 basically required government contractors to assist in ending discrimination against employees with disabilities by requiring them to "take affirmative action to employ and advance in employment qualified handicapped individuals." Pub.L. No. 93–112, 87 Stat. 393 (1973) (codified as amended at 29 *U.S.C.A.* § 793). Likewise, Section 504 prohibited federal grant recipients from discriminating against people with disabilities, using general language that has elicited descriptions of the law such as the "civil rights bill of the disabled," *Ams. Disabled for Accessible Pub.*

*Transp. v. Skinner,* 881 *F.*2d 1184, 1187 (3d Cir.1989) (en banc), and that soon became the basis for expansive federal regulations, *see, e.g.,* 45 *C.F.R.* § 84.11(a)(1) (providing that "[n]o qualified handicapped person shall, on the basis of handicap, be subjected to discrimination in employment under any program or activity to which this part applies"); 45 *C.F.R.* § 84.11(a)(3) (requiring recipients of federal funding to make all employment decisions for applicable programs "in a manner which ensures that discrimination on the basis of handicap does not occur" or "in any way that adversely affects their opportunities or status because of handicap").

Our Legislature did not amend the LAD as a direct result of the enactment of the Rehabilitation Act of 1973, but our statute continued to evolve by expanding the sections that define what qualifies as a disability and who is considered to be a disabled person entitled to the statute's protections. In 1977, for example, the Legislature amended the LAD to define "blind person," "guide dog" and "guide dog trainer," and to add protections for blind persons, *see L.* 1977, *c.* 456, §§ 1–2, similar to the pre-existing employment protections for other persons with disabilities, *see id.* at § 2 (adding *N.J.S.A.* 10:5–29.1).

In 1978, the Legislature acted again, expanding the definition of handicapped well beyond those with physical disabilities, *see L.* 1978, *c.* 137, § 3 (adding "mental, psychological or developmental disabilit[ies]"), including persons who have "been at any time handicapped," *see id.* at § 2, and amending the employment protections correspondingly, *see, e.g., ibid.* (deleting qualifier "physical" from *N.J.S.A.* 10:5–4.1). Throughout the years that followed, the LAD was repeatedly amended to add protections for a variety of disorders, illnesses, and conditions. *See, e.g., L.* 1980, *c.* 46, §§ 4, 5 (extending protections to deaf persons); *L.* 1981, *c.* 185, § 1 (extending protections to persons with blood traits for numerous disorders); *L.* 1991, *c.* 493, § 1 (amending definition of handicapped to include persons with AIDS and HIV).

In 1984, the New Jersey Division on Civil Rights, acting pursuant to its statutory authority, *see N.J.S.A.* 10:5–8(g), proposed regulations relating to persons with disabilities. *See* 16 *N.J.R.* 838 (Apr. 16, 1984). Those regulations are the direct predecessors to the regulations addressing reasonable accommodation in employment, *see N.J.A.C.* 13:13–2.1 to –2.8, that bear upon the issue in this appeal. In proposing the regulations, the Division specifically relied on the federal regulations adopted pursuant to Section 504 and expressed its intent to "bring the New Jersey law into conformity with existing federal regulations pertaining to discrimination against the handicapped." 16 *N.J.R.* 838.

Two of the regulations, both as proposed and as currently in force, relate to reasonable accommodation, with the first, *N.J.A.C.* 13:13–2.5, setting forth the requirement that there be a reasonable accommodation, and the second, *N.J.A.C.* 13:13–2.8, identifying exceptions that excuse an employer from complying with that requirement. In explaining the meaning of the proposed reasonable accommodation regulation, *see N.J.A.C.* 13:13–2.5, the Division followed the Section 504 approach, noting that the employer had an "obligation to make reasonable changes in the work environment that will enable a handicapped employee or applicant to perform the particular job sought," subject to an exception if "the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." 16 *N.J.R.* 839.

After the notice and comment period, the Division revised the proposed regulations, modifying the original version of *N.J.A.C.* 13:13–2.5 in two notable ways. The first change was designed "to make clear that employers are required to conduct all aspects of their employment procedures in a nondiscriminatory manner." 17 *N.J.R.* 672 (Mar. 18, 1985) (explaining revision to *N.J.A.C.* 13:13–2.5(a)). The second clarified that all claims of discrimination would be evaluated individually and "that employers must consider the possibility of reasonable accommodation when making employment decisions about handicapped persons." *Ibid.* (explaining

clarification to *N.J.A.C.* 13:13–2.5(b)). Following the notice and comment period for the proposed revised regulations, the Division set forth further explanations and clarifications. In response to one comment, the Division clarified that requiring employers to consider reasonable accommodations before taking negative employment action, *see N.J.A.C.* 13:13–2.5(b)(2), "was not intended to lessen the requirement of reasonable accommodation. Rather, the rule is intended to encourage employers to engage in a certain thought process whereby they consider reasonable accommodation before refusing to hire, promote, etc. a handicapped person." 17 *N.J.R.* 1575 (June 17, 1985).

Finally, the Division rejected a criticism aimed at the entirety of the regulations, pointing out that the reasonable accommodation requirement was "implicit in the statutory standard that a person may not be refused employment on account of handicap unless the nature and extent of the handicap 'reasonably precludes' job performance." *Ibid.* (citing *Griggs v. Duke Power Co.,* 401 *U.S.,* 424, 91 *S.Ct.* 849, 28 *L.Ed.*2d 158 (1971)). Although the regulations have been re-adopted regularly without significant substantive alteration [4] ever since their original promulgation in 1985, they do not shed light on whether a failure to accommodate, absent an adverse employment consequence, is actionable.

In 1990, Congress enacted the ADA, long regarded as an important source of guidance in matters relating to rights of persons with disabilities, in which it identified four purposes. Those purposes are: "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[,]" 42 *U.S.C.A.* § 12101(b)(1); "to pro-

---

[4] The Division has commented occasionally about published opinions from this and other courts during the repromulgation process. *See* 37 *N.J.R.* 2607(a) (July 18, 2005) (proposing clarification to *N.J.A.C.* 13:13–2.5(b)(ii); commenting that purpose was to reject Third Circuit's analysis in *Conoshenti v. Public Service Electric & Gas Co.,* 364 *F.*3d 135, 151 (3d Cir.2004), as inconsistent with cited federal and state court precedents); 22 *N.J.R.* 1437 (May 21, 1990) (noting Supreme Court's approval of portions of regulations; citing *Jansen v. Food Circus Supermarkets, Inc.,* 110 *N.J.* 363, 541 *A.*2d 682 (1988)).

vide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities[,]" *id.* at (b)(2); "to ensure that the Federal Government plays a central role in enforcing the standards established in this Act on behalf of individuals with disabilities[,]" *id.* at (b)(3); and "to invoke the sweep of congressional authority . . . to address the major areas of discrimination faced day-to-day by people with disabilities[,]" *id.* at (b)(4). *See* 101 Pub.L. No. 336, 104 Stat. 329 (1990) (same).

Although in enacting the ADA, Congress broadly[5] attacked discrimination against persons with disabilities, our focus is solely on Title I, which targets employment. The ADA's employment rights provisions are both expansive in scope and specific in detail. The ADA prohibits employers from discriminating against a qualified individual because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 *U.S.C.A.* § 12112(a).

In addition to that sweeping charge, the ADA includes a list of acts and practices that are prohibited. Of particular relevance to this dispute, that list specifically includes the failure to make reasonable accommodations for an applicant's or employee's disabilities, unless doing so would impose an undue hardship on the employer's business operations. 42 *U.S.C.A.* § 12112(b)(5)(A). Moreover, the meaning of that phrase is not left to chance, because "reasonable accommodation" is also defined, and includes "making existing facilities used by employees readily accessible to and usable by individuals with disabilities," as well as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations,

---

[5] In addition to employment, the other titles of the ADA address discrimination in public services, public accommodations, services operated by private entities, and telecommunications. *See Zimmerman v. Or. Dep't of Justice,* 170 *F.*3d 1169, 1172 & n. 1 (9th Cir.1999) (describing structure of ADA), *cert. denied,* 531 *U.S.* 1189, 121 *S.Ct.* 1186, 149 *L.Ed.*2d 103 (2001).

training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 *U.S.C.A.* § 12111(9)(A), (B).

The specific mandate requiring reasonable accommodations was not a new right for persons with disabilities, but instead reflected the fact that the ADA was drafted with intentional fidelity to Section 504 and its implementing regulations. *See* 42 *U.S.C.A.* § 12201(a) (specifying that ADA shall not be construed to apply lesser standard than Rehabilitation Act); S.Rep. No. 101–116 at 26, 34, 101st Cong.2d Sess. (1989), *reprinted in* 1990 *U.S.Code Cong. & Admin. News* 247, 325–26.

Although the Rehabilitation Act did not use the phrase "reasonable accommodation," federal courts had interpreted that statute to require it, *see Carter v. Bennett,* 840 *F.*2d 63, 65 (D.C.Cir.1988) (explaining Section 501 imposes obligation on federal employers to reasonably accommodate); *Prewitt v. U.S. Postal Serv.,* 662 *F.*2d 292, 307 & n. 21 (5th Cir.1981) (explaining Sections 501 and 504 require federal employers to provide reasonable accommodation to handicapped), as did the statute's implementing regulations, *see* 45 *C.F.R.* § 85.53 (1980); 29 *C.F.R.* § 1613.704(a); *see also Buckingham v. United States,* 998 *F.*2d 735, 739 (9th Cir.1993) (explaining history of federal regulations). The ADA's reliance on the Rehabilitation Act sets it apart from other anti-discrimination statutes, including Title VII, 42 *U.S.C.A.* §§ 2000e to 2000e–17 (prohibiting employers from discriminating based on race, color, religion, sex, or national origin, 42 *U.S.C.A.* § 2000e–2(a)).[6]

---

6 Although Title VII includes a reasonable accommodation right relating to religion, 42 *U.S.C.A.* § 2000e(j), the United States Supreme Court has construed an employer's obligation to accommodate religious obligations so as to essentially equate a de minimis burden on an employer with undue hardship. *See Ansonia Bd. of Educ. v. Philbrook,* 479 *U.S.* 60, 66, 107 *S.Ct.* 367, 371, 93 *L.Ed.*2d 305, 313 (1986) (holding that employers may choose any reasonable accommodation pursuant to Title VII); *Trans World Airlines, Inc. v. Hardison,* 432 *U.S.* 63, 84, 97 *S.Ct.* 2264, 2277, 53 *L.Ed.*2d 113, 131 (1977) (noting that de minimis costs constitute undue burden within meaning of Title VII); *see also* Stephen F. Befort, *Reasonable Accommodation and Reassignment Under the Americans with*

■ After the ADA was enacted, protections for persons with disabilities that mirror its reasonable accommodation provisions continued to be found in the LAD's implementing regulations rather than in the statute itself. And it was not until 2003 that the LAD's more general prohibitions on discrimination were extended to persons with disabilities through the addition of "disability" to the list of those accorded protected status. *See L.* 2003, *c.* 180 § 4 (eff. Jan. 1, 2004) (amending *N.J.S.A.* 10:5–4). The legislative history makes plain that the intent of that amendment was to make our law comply with the Federal Fair Housing Act and to access Housing and Urban Development funding from the federal government. *See, e.g.,* Assembly Housing and Local Government Committee, *Statement to Assembly Bill No. 3774* (June 16, 2003) (expressing intention "to provide substantially equivalent protections against discrimination to those provided under the Federal Fair Housing Act[,] ... to achieve certification by the Federal Department of Housing and Urban Development (HUD)[,] ... and thereby to receive federal reimbursement"); Senate Community and Urban Affairs Committee, *Statement to Bill S. 2454* (June 9, 2003) (expressing intention "to provide substantially equivalent protections against discrimination to those provided under the Federal Fair Housing Act"). Because the focus was on achieving consistency with the Federal Fair Housing Act, the bill not only amended the LAD to include references to disabilities, but made numerous other changes to the LAD relating to nationality and housing rights. *See, e.g., L.* 2003, *c.* 180, § 12 (amending *N.J.S.A.* 10:5–12(i)(1), (2) to prohibit discrimination based on disability in securing loans or extending credit; adding subsection *N.J.S.A.* 10:5–12(*o* ) on practices of multiple listing services, real estate brokers, and similar entities in housing sales and rental); *id.* at § 16 (amending *N.J.S.A.* 10:5–17 to add remedy for emotional distress for housing violations).

---

*Disabilities Act: Answers, Questions and Suggested Solutions After U.S. Airways, Inc. v. Barnett,* 45 *Ariz. L.Rev.* 931, 936 n. 18 (2003) (distinguishing between reasonable accommodation requirements in Title VII and in ADA).

Significantly, the 2003 amendment marked the first time that persons with disabilities were included in the section of the LAD which is the heart of all employment discrimination claims, *N.J.S.A.* 10:5–12, and which identifies unlawful employment practices. *See L.* 2003, *c.* 180, § 12 (amending *N.J.S.A.* 10:5–12 to add disability as protected category). In explaining its purpose, the Legislature added the following comments about the effect of its amendment generally:

> [u]nder current law, the provisions of the "Law Against Discrimination" that enumerate the categories of protection under the statute do not specifically include "handicap." Instead, [the existing statute] generally provides that it is unlawful to discriminate against any person because such person is or has been handicapped. This bill would add "disability" to each portion of the statute in which the protected categories are listed, thereby providing consistency and clarity to this area of the law.
>
> [Senate Community and Urban Affairs Committee, *Statement to Senate Bill No. 2454* (June 9, 2003).]

The 2003 addition of persons with disabilities as a protected class, however, left intact both statutory sections that created limitations on the employment rights of disabled persons. *See N.J.S.A.* 10:5–4.1, –29.1. That is, for persons with disabilities, there remained exceptions if an employer could show that the disability "reasonably precludes the performance of the particular employment," *N.J.S.A.* 10:5–4.1, or "would prevent such person from performing a particular job," *N.J.S.A.* 10:5–29.1. Those exceptions, however, had long been understood to function as interpreted by the regulations embracing the reasonable accommodation paradigm created under Section 504 and the ADA.

■ We can infer, since the Legislature has never amended the LAD to afford rights to the disabled that are different from those found in Section 504 and the ADA, that the regulatory interpretation matches the Legislature's intent. And we find further support for that understanding in a subsequent amendment to the LAD. In enacting a bill in 2007,[7] *see L.* 2007, *c.* 325 (eff. Jan. 13,

---

[7] The bill as originally proposed had reasonable accommodations for religious practices as its sole focus. *See* A. 3451. In committee, the bill was amended to

2008) (amending *N.J.S.A.* 10:5–12 to add subsection (q)), the Legislature referred to reasonable accommodations, but only in the context of religious discrimination. In doing so, the Legislature created a framework that balances the rights of employers, employees seeking to avoid having to violate or forgo a sincerely held religious practice or observance, and other employees who might be affected thereby.

The significance, however, of that amendment is not that it created reasonable accommodation rights for people of faith when it had not done so for people with disabilities. Instead, it is that the amendment gave people of faith rights that exceeded those afforded them through the United States Supreme Court's interpretation of Title VII.[8] The fact that the Legislature saw the need to correct that imbalance suggests strongly that it regards the reasonable accommodation rights for people with disabilities to be appropriately protected by the extant published decisions and the regulations interpreting those rights found in the LAD in accordance with the sweeping protections of the ADA.

## V.

The foregoing historical analysis sets the stage for our consideration of whether the LAD's failure to accommodate cause of action includes adverse employment consequence as one of the elements of the prima facie case.

---

add gender identity as a protected class, to create new definitions and subsections relating to gender identity, and to bring the language of the LAD generally into compliance with the domestic partnership act. *See* Assembly Bill No. 3451 (amended Feb. 26, 2007 to include portions of corollary Senate Bill No. 2488 relating to gender identity and domestic partnership statute). Those alterations did not affect the reasonable accommodation provisions.

[8] We have discussed the United States Supreme Court's interpretations limiting the meaning of the terms used to create accommodations under Title VII previously. *See ante* at 404-05 n. 6, 4 *A*.3d at 139 n. 6.

## A.

All employment discrimination claims require the plaintiff to bear the burden of proving the elements of a prima facie case. Although most employment discrimination claims proceed in accordance with the *McDonnell Douglas* [9] burden-shifting paradigm, *see Goodman v. London Metals Exch.*, 86 *N.J.* 19, 31–32, 429 *A.*2d 341 (1981) (utilizing *McDonnell Douglas* framework); *Peper v. Princeton Univ. Bd. of Trs.*, 77 *N.J.* 55, 82–83, 389 *A.*2d 465 (1978) (embracing *McDonnell Douglas* framework), the first step in that analysis requires plaintiff to demonstrate that he or she can meet each of the elements of the prima facie case. *McDonnell Douglas, supra,* 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 677. We have referred to that burden as "rather modest," *Zive v. Stanley Roberts, Inc.,* 182 *N.J.* 436, 447, 867 *A.*2d 1133 (2005) (quoting *Marzano v. Computer Sci. Corp.,* 91 *F.*3d 497, 508 (3d Cir.1996)), but it remains the plaintiff's burden nonetheless.

There is no single prima facie case that applies to all employment discrimination claims. Instead, the elements of the prima facie case vary depending upon the particular cause of action. For example, the prima facie elements for a complaint arising from the failure to hire, regardless of whether that claim is based on race, sex or handicap, are: (1) that plaintiff falls within a protected class; (2) that plaintiff was qualified for the work for which he or she applied; (3) that plaintiff was not hired; and (4) that the employer continued to seek others with the same qualifications or hired someone with the same or lesser qualifications

---

[9] *McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973). In *McDonnell Douglas,* the United States Supreme Court created a three-part burden shifting mechanism applicable to discrimination claims. That framework requires the plaintiff to demonstrate a prima facie case of discrimination, following which the burden shifts to the defendant to demonstrate a legitimate business reason for the employment decision. If the employer does so, the burden shifts again and the plaintiff is required to demonstrate that the reason proffered is a mere pretext for discrimination. *Id.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 677.

who was not in the protected status. *Andersen v. Exxon Co.*, 89 *N.J.* 483, 492, 446 *A.2d* 486 (1982). If the claim is based upon discriminatory discharge, the prima facie case is similar, in that plaintiff must demonstrate: (1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job. *Clowes v. Terminix Int'l, Inc.*, 109 *N.J.* 575, 596–97, 538 *A.2d* 794 (1988).

On the other hand, the prima facie elements of a retaliation claim under the LAD [10] requires plaintiff to demonstrate that: (1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence. *Woods–Pirozzi v. Nabisco Foods*, 290 *N.J.Super.* 252, 274, 675 *A.2d* 684 (App.Div.1996); *cf. Carmona v. Resorts Int'l Hotel, Inc.*, 189 *N.J.* 354, 371–73, 915 *A.2d* 518 (2007) (construing element four to include proving original complaint was made reasonably and in good faith). A hostile environment claim, first recognized by this Court as a variety of LAD discrimination, has as its prima facie elements: (1) that plaintiff is in a protected class; (2) that plaintiff was subjected to conduct that would not have occurred but for that protected status; and (3) that it was severe or pervasive enough to alter the conditions of employment. *See Lehmann, supra*, 132 *N.J.* at 603–04, 626 *A.2d* 445.

As these examples demonstrate, there is no single prima facie case that applies to all discrimination claims. Instead, the prima facie elements of a claim vary depending upon the particular

---

[10] The LAD-based claim for retaliation is similar but not identical to the statutory claim for retaliation created in CEPA. *See Tartaglia v. UBS Paine-Webber, Inc.*, 197 *N.J.* 81, 104–06, 961 *A.2d* 1167 (2008) (describing CEPA elements).

employment discrimination claim being made. What they traditionally share, however, is the requirement that plaintiff endure an adverse employment consequence as a result of the discriminatory act.

## B.

Identifying the elements of the prima facie case that are unique to the particular discrimination claim is critical to its evaluation. Disability discrimination claims are different from other kinds of discrimination claims, for several reasons. That is, for claims of disability discrimination, the first element of the prima facie case, that plaintiff is in a protected class, requires plaintiff to demonstrate that he or she qualifies as an individual with a disability, or who is perceived as having a disability, as that has been defined [11] by statute. The second element requires plaintiff to demonstrate that he or she is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without a reasonable accommodation. *See Raspa v. Office of Sheriff,* 191 *N.J.* 323, 336, 924 *A.*2d 435 (2007) (explaining outer limits of LAD protections for persons with disabilities); *Jansen v. Food Circus Supermarkets, Inc.,* 110 *N.J.* 363, 373–74, 541 *A.*2d 682 (1988) (noting that LAD, *N.J.S.A.* 10:5–2.1, does not preclude establishment of bona fide qualifications).

Our consideration of the elements of the prima facie case for a reasonable accommodation claim begins with a review of the statutory bases for those claims. The ADA defines discrimination against persons with disabilities generally.

(a) General rule. No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

---

[11] Notably, the statutory definitions in our LAD are significantly broader than those in the ADA or in Section 504, both of which require that the disability substantially limit a major life activity. We have described the difference by noting that, unlike the ADA, our LAD "is not restricted to 'severe' or 'immutable' disabilities." *Viscik v. Fowler Equip. Co.,* 173 *N.J.* 1, 16, 800 *A.*2d 826 (2002).

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.
[42 *U.S.C.A.* § 12112(a).]

The ADA's specific protection relating to accommodations is found in a succeeding subsection, the purpose of which is to aid in the construction of the general rule. That section provides:

(b) Construction. As used in subsection (a), the term "discriminate against a qualified individual on the basis disability" includes[:]

. . .

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]

[42 *U.S.C.A.* § 12112(b)(5)(A).]

Applying a literal reading to those provisions suggests that a disability discrimination claim must include some form of adverse employment consequence, because the general rule established in section (a) qualifies the word "discriminate" with the phrase "in regard to" and then lists several forms of employment-related actions. Continuing with a literal reading of the statute, its next provision defines the "construction" to be given to the general rule. That section, 42 *U.S.C.A.* § 12112(b), also supports the conclusion that the subsections that follow, one of which is the failure to reasonably accommodate, § 12112(b)(5)(A), are forms of discrimination, but that they are not separated from the adverse employment consequence requirement of the general rule set forth in § 12112(a).

Moreover, interpreting the reasonable accommodation protections in the context of the familiar prima facie cases for other forms of discrimination also suggests that an adverse employment consequence is included as an element of proof. That is, the prima facie case would require the plaintiff to prove that he or she was disabled, that he or she performed or could have performed the job with or without an accommodation, and that there was an adverse consequence. Using that framework, the second prong of the prima facie case would entail proof of either the failure to

accommodate or the failure to engage in the interactive process, but it would not extinguish the requirement that plaintiff demonstrate an adverse employment consequence.

Whatever can be said about the literal language of the ADA, as we have demonstrated, the LAD does not directly answer the question because its reasonable accommodation protections are not explicit. Instead, we recognize that the LAD's overarching goal is the "eradication 'of the cancer of discrimination.'" *Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 *A.2d* 652 (quoting *Jackson v. Concord Co.,* 54 *N.J.* 113, 124, 253 *A.2d* 793 (1969)), *cert. denied,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.2d* 51 (1988). Affording persons with disabilities reasonable accommodation rights is consistent with the LAD's broad remedial purposes, *see Viscik, supra,* 173 *N.J.* at 19–20, 800 *A.2d* 826 (noting two reasonable accommodation issues in handicap discrimination litigation); *Muller v. Exxon Research & Eng'g Co.,* 345 *N.J.Super.* 595, 608, 786 *A.2d* 143 (App.Div.2001) (noting parameters of LAD reasonable accommodation requirement), *certif. denied,* 172 *N.J.* 355, 798 *A.2d* 1269 (2002); *Jones v. Aluminum Shapes, Inc.,* 339 *N.J.Super.* 412, 772 *A.2d* 34 (App.Div.2001) (interpreting LAD to include reasonable accommodation requirement), and the administrative regulations appropriately have so recognized, *see Potente v. County of Hudson,* 187 *N.J.* 103, 110–11, 900 *A.2d* 787 (2006) (citing *N.J.A.C.* 13:13–2.5(b), –2.8(a)).

C.

It is against this background that we consider whether or not the failure to accommodate a disability in and of itself can be compensable, as the trial court concluded, or whether it must be accompanied by an adverse employment consequence, as the Appellate Division held. Because plaintiff cannot and does not assert that he suffered an adverse employment consequence as a result of the failure to accommodate him during the four-hour period on December 11, when he returned to full duty, the

different approaches to this question adopted by the trial and appellate courts led to contrary outcomes for his claim.

Published decisions of New Jersey courts uniformly identify adverse employment consequence as one element of the prima facie case for disability discrimination. Those opinions do so, however, in part because they recite the familiar elements consistent with any employment discrimination case, and in part because the factual setting of each case included an adverse job consequence. For example, this Court has touched on the question of reasonable accommodations, but only as to an employee who contended that the failure to accommodate resulted in termination, making separate consideration of adverse employment consequence irrelevant. *See Raspa, supra,* 191 *N.J.* at 327, 340, 924 *A.*2d 435 (recognizing that some employment positions have requirements similar to the bona fide occupational qualifications set forth in federal law that impact on reasonable accommodation analysis); *Potente, supra,* 187 *N.J.* at 111, 900 *A.*2d 787 (concluding that employee may not raise LAD claim if he or she has refused to engage in interactive dialogue respecting potential accommodations).

Published opinions of our Appellate Division and trial courts also have included adverse employment consequence in reciting the prima facie elements of a cause of action for failure to accommodate. *See, e.g., Bosshard v. Hackensack Univ. Med. Ctr.,* 345 *N.J.Super.* 78, 90–91, 783 *A.*2d 731 (App.Div.2001); *Seiden v. Marina Assocs.,* 315 *N.J.Super.* 451, 465–66, 718 *A.*2d 1230 (Law Div.1998). However, both of those disputes also arose in the context of employees who had been terminated. *See Bosshard, supra,* 345 *N.J.Super.* at 81, 783 *A.*2d 731; *Seiden, supra,* 315 *N.J.Super.* at 458, 718 *A.*2d 1230.

There are, however, two decisions in which our courts appear to suggest that adverse employment consequence was not needed. The first, a reference in *Seiden* that seems to equate the failure to accommodate with an unlawful employment practice, is included as part of the court's explanation about why the *McDonnell Douglas*

burden-shifting framework is not useful in the context of a failure to accommodate claim. *See Seiden, supra,* 315 *N.J.Super.* at 459–61, 718 *A.2d* 1230 (concluding *McDonnell Douglas* disparate treatment analysis not necessary in failure to accommodate disability claim).

The second example is found in the Appellate Division's identification of the elements of the prima facie case for a disability discrimination claim based on an employer's failure to engage in an interactive accommodation process, in which the court did not include the requirement that the employee suffer an adverse employment consequence. *See Tynan v. Vicinage 13 of the Superior Court of N.J.,* 351 *N.J.Super.* 385, 400–01, 798 *A.2d* 648 (App.Div.2002) (adopting standard for informal interactive process set forth in federal regulations). There, the court focused on the regulations implementing the LAD that require employers to make reasonable accommodations unless those accommodations would create an undue hardship, *id.* at 397, 798 *A.2d* 648 (quoting *N.J.A.C.* 13:13–2.5(b)), and the federal regulations adopted pursuant to the ADA that create an informal interactive process for finding a reasonable accommodation, *id.* at 400, 798 *A.2d* 648 (relying on 29 *C.F.R.* § 1630.2(*o* )(3)). The court, in rejecting the employer's assertion that the employee had not requested an accommodation, concluded that neither a specific request nor the use of any "magic words" is needed in order for an employee to be entitled to an interactive process focused on creating or accessing an accommodation. *Id.* at 399–400, 798 *A.2d* 648.

As part of that analysis, the Appellate Division identified the elements that an employee with a disability would need to prove in order to demonstrate that the employer had failed to engage in that interactive process. *Id.* at 400–01, 798 *A.2d* 648. It did not include adverse employment consequence among those requirements, but in explaining its reasoning, the panel referred to a federal precedent that suggests implicitly the need for such a link. The panel quoted the Third Circuit's language that an " 'employer who acts in bad faith in the interactive process will be liable if the

jury can reasonably conclude that the employee would have been able to perform the job with accommodations.'" *Id.* at 404, 798 *A.*2d 648 (quoting *Taylor v. Phoenixville Sch. Dist.,* 184 *F.*3d 296, 317–18 (3d Cir.1999)). In doing so, the court returned to the fundamental notion that there is a relationship between the accommodation and the job, and that the absence of the accommodation adversely affects the ability to do the job.

Because the plaintiff in *Tynan* had been terminated, *id.* at 389, 798 *A.*2d 648, the court might have found it unnecessary to comment on the need to demonstrate an adverse employment consequence. Nonetheless, the court's opinion in *Tynan* has given rise to the suggestion that the prima facie case does not include that element at all. Much of the debate arises from the *Tynan* court's reliance on the Third Circuit's *Taylor* decision, in which that court identified the elements of the claim for failure to engage in an interactive process of accommodation:

> To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.
>
> [*Taylor, supra,* 184 *F.*3d at 319–20.]

The court in *Taylor* cited three earlier decisions on which it relied in devising its test, each of which set forth some, but not all, of the elements it embraced. *See, e.g., Mengine v. Runyon,* 114 *F.*3d 415, 420 (3d Cir.1997) (evaluating failure to engage in interactive process in context of Rehabilitation Act); *Bultemeyer v. Fort Wayne Cmty. Schs.,* 100 *F.*3d 1281, 1283–85 (7th Cir.1996) (rejecting *McDonnell Douglas* paradigm; requiring proof of disability, employer's awareness of disability, and ability to perform essential functions of job with or without accommodation); *Taylor v. Principal Fin. Group, Inc.,* 93 *F.*3d 155, 165 (5th Cir.1996) (discussing interactive process generally).

The Third Circuit in *Taylor,* however, did not identify those four factors as if they created the entirety of the proofs that

a plaintiff must advance in order to recover under the ADA for a failure to accommodate. Rather, the opinion established its over-all framework at the outset by identifying the elements of the prima facie case for ADA discrimination that all plaintiffs must prove, including an adverse employment consequence. As the court explained:

> in order for a plaintiff to establish a prima facie case of discrimination under the ADA, the plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."
> [*Taylor, supra,* 184 *F.*3d at 306 (quoting *Gaul v. Lucent Techs.,* 134 *F.*3d 576, 580 (3d Cir.1998) (citation omitted)).]

The *Taylor* decision, therefore, did not divorce failure to accommodate from the essential elements of all other disability discrimination claims; rather, the elements of the failure to accommodate claim appear as a subset of the second prong of the ordinary prima facie case.

The parties in this appeal, however, point to a more recent Third Circuit opinion, arguing that it demonstrates that in some circumstances the failure to accommodate alone satisfies the adverse employment consequence. *See Williams, supra,* 380 *F.*3d at 761 (expanding on explanation of elements of prima facie case). In *Williams,* the court commented that "[a]dverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities," *ibid.,* thus collapsing the two traditional proof elements into one. Again, however, the appeal involved an employee who was terminated rather than accommodated, *id.* at 758, leaving open to debate whether the court's reference to "this context" was intended to limit its explanatory phrase about the prima facie case to situations in which there has been a clear adverse employment consequence.

The strongest support for the assertion that a failure to accommodate claim can proceed absent an adverse employment consequence is found in decisions from the Seventh Circuit, one of which the Third Circuit has relied upon, albeit in a different

context. *See, e.g., Lavia v. Pennsylvania,* 224 *F.*3d 190, 203–04 (3d Cir.2000) (relying on "most penetrating analysis" of ADA's constitutionality; citing *Erickson v. Bd. of Governors,* 207 *F.*3d 945 (7th Cir.2000) and *Stevens v. Ill. Dep't of Transp.,* 210 *F.*3d 732 (7th Cir.2000)). The Seventh Circuit has followed its own path, coming close to explicitly recognizing failure to accommodate as a freestanding cause of action, and therefore meriting discussion.

The earliest decision in the Seventh Circuit's evolution toward a potentially freestanding cause of action rejected an employee's claim that her employer failed to reasonably accommodate her when it refused to permit her to work at home. *See Vande Zande v. Wis. Dep't. of Admin.,* 44 *F.*3d 538, 544 (7th Cir.1995). Chief Judge Posner analyzed the ADA as being more broadly protective than other civil rights legislation, because it did not simply seek to eradicate discrimination when one's disability, like one's race, is irrelevant to one's ability to do a job, but also demanded that people with disabilities be afforded reasonable accommodations to enable them to do a job in the first place. *Id.* at 541–42. In concluding that the plaintiff's accommodation demands, which included that she not be required to use sick time, were unreasonable, *id.* at 544–45, the court did not set forth the elements of a prima facie case. However, by not directly addressing whether the loss of sick time was an adverse employment consequence, *id.* at 545, it set the stage for the possibility of a freestanding failure to accommodate claim.

A year later, the Seventh Circuit relied on *Vande Zande* to reject two different plaintiffs' failure to accommodate claims based on a reasonableness analysis, and both times in the context of a termination. *See Beck v. Univ. of Wis. Bd. of Regents,* 75 *F.*3d 1130, 1135–36 (7th Cir.1996) (rejecting claim because plaintiff's preferred, specific accommodation was known only to her); *Bombard v. Fort Wayne Newspapers, Inc.,* 92 *F.*3d 560, 563 (7th Cir.1996) (relying on *Beck* to conclude that terminated employee who failed to report to work following short-term leave and did not

advise employer of claimed continuing disability could not demonstrate failure to accommodate).

Later in 1996, however, the court issued an opinion using the language that became the basis for the assertion that there is a freestanding cause of action for failure to accommodate. *See Bultemeyer, supra,* 100 *F.*3d 1281. The court's focus was on whether the *McDonnell Douglas* burden-shifting paradigm had any application to a failure to accommodate claim, as opposed to a disparate impact disability discrimination claim. *Id.* at 1283–84. In concluding that a different analytical model should be substituted for *McDonnell Douglas,* the court drew a distinction between those two forms of disability discrimination. *Ibid.* Although that analytical approach did not suggest divorcing a failure to accommodate claim from an adverse employment consequence, the language identifying two forms of disability discrimination paved the way for that argument.

Initially, that language from *Bultemeyer* was cited as part of the background explanation for a disability discrimination analysis, and always in the context of a plaintiff who had suffered an adverse employment consequence associated with the failure to accommodate. *See, e.g., Sieberns v. Wal–Mart Stores,* 125 *F.*3d 1019, 1022 (7th Cir.1997) (citing *Bultemeyer* and *Bombard;* commenting on reasonable accommodation claims generally); *Weigel v. Target Stores,* 122 *F.*3d 461, 464 (7th Cir.1997) (citing *Bultemeyer* in context of disparate treatment based on disability). Indeed, in 1999, the court returned to a traditional formulation of the elements of a prima facie case for disability discrimination based on a failure to accommodate, including as one of them that the employee demonstrate an adverse employment consequence. *See Foster v. Arthur Andersen, LLP,* 168 *F.*3d 1029, 1032 (7th Cir. 1999) (explaining that "to state a prima facie case of 'failure to accommodate' disability discrimination, a plaintiff who has suffered an adverse employment action must show that … the disability caused the adverse employment action (a factor which is implied if not stated)"). That articulation has been utilized by

trial courts in the Seventh Circuit. *See, e.g., Lewis v. Henderson,* 249 *F.Supp.*2d 958, 967 (N.D.Ill.2003) (citing *Foster* for prima facie case; concluding plaintiff could not meet ADA definition of disability); *Seisser v. Platz Flowers & Supply, Inc.,* 129 *F.Supp.*2d 1130, 1134–35 (N.D.Ill.2000) (concluding that forced retirement is adverse employment consequence); *Pluta v. Ford Motor Co.,* 110 *F.Supp.*2d 742, 748 (N.D.Ill.2000) (citing *Foster* test for failure to accommodate as background for disparate treatment claim).

A year later, however, the Seventh Circuit cited *Foster* but rearticulated the elements of a disability discrimination claim's prima facie case. *See Stevens, supra,* 210 *F.*3d at 736. Although the issue in *Stevens* was whether an employer was entitled to Eleventh Amendment immunity, making evaluation of the prima facie case irrelevant, the court took a new direction:

> To make out a claim under the ADA, an individual must show: 1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability *or* failed to make a reasonable accommodation.
>
> [*Ibid.* (emphasis added).]

The *Stevens* articulation of the prima facie test has been regularly cited in published decisions emanating from the Seventh Circuit ever since, but it has been almost invariably in failure to accommodate cases in which the plaintiff suffered an adverse employment consequence, or in claims based on other forms of disability discrimination. *See, e.g., Winsley v. Cook County,* 563 *F.*3d 598, 603 (7th Cir.2009) (reciting test in retaliatory hostile work environment claim; concluding plaintiff did not suffer disability cognizable under ADA); *Owens v. St. Agnes Healthcare,* 525 *F.Supp.*2d 1029, 1032–33 (N.D.Ill.2007) (reciting test in disparate treatment termination case; concluding plaintiff did not suffer disability cognizable under ADA); *Jackson v. Chicago,* 521 *F.Supp.*2d 745, 748 (N.D.Ill.2007) (reciting test in disparate treatment case; concluding plaintiff could not demonstrate that he was qualified to perform essential job functions).

The sole published decision in which a court considered whether the *Stevens* decision contemplated a failure to accommodate claim free of the need to demonstrate an adverse employment conse-quence concluded that it did, but arose in an unusual procedural posture. *See Nawrot v. CPC Int'l,* 259 *F.Supp.*2d 716 (N.D.Ill. 2003). In that case, the plaintiff had been terminated, but as part of an appeal from an earlier verdict, his claim that the termination was discriminatory had been rejected, with the result that his failure to accommodate claim could only proceed if he did not need to prove an adverse employment consequence. *Id.* at 718. On remand, the court read the ADA's language about reasonable accommodations, *see* 42 *U.S.C.A.* § 12112(b)(5)(A), as an expansion rather than a clarification of the general rule proscribing discrimi-nation, *see id.* at § 12112(a). The court therefore read the statute to create an affirmative duty for employers to reasonably accom-modate employees' disabilities and, in doing so, also interpreted it to create a potential cause of action arising from a failure to accommodate with or without an adverse employment conse-quence. *Nawrot, supra,* 259 *F.Supp.*2d at 724. No court outside of the Seventh Circuit has embraced the *Stevens* articulation of the prima facie case for disability failure to accommodate in place of the more traditional *Foster* version of the test, *see, e.g., Fenney v. Dakota, Minn. & E. R.R. Co.,* 327 *F.*3d 707, 716 (8th Cir.2003) (adopting *Foster's* requirement that there be proof of adverse employment consequence as part of prima facie case), nor followed the lead of *Nawrot. Cf. Wade v. DaimlerChrysler Corp.,* 418 *F.Supp.*2d 1045, 1051 (E.D.Wis.2006) (citing *Stevens, supra,* 210 *F.*3d at 736; *Nawrot, supra,* 259 *F.Supp.*2d at 721–23; setting forth prima facie elements in context of defendant's waiver of issue on appeal).

## VI.

■ Although the question therefore remains unsettled in the federal courts, our LAD's broad remedial purposes and the wide scope of its coverage for disabilities as compared to the ADA

support an expansive view of protecting rights of persons with disabilities in the workplace. *See, e.g., Viscik, supra,* 173 *N.J.* at 16, 800 *A.*2d 826 (concluding that unlike ADA, disability under LAD need not be " 'severe' or 'immutable' "); *Clowes, supra,* 109 *N.J.* at 593, 538 *A.*2d 794 (concluding that LAD covers alcoholism); *Soules v. Mount Holiness Mem. Park,* 354 *N.J.Super.* 569, 574, 808 *A.*2d 863 (App.Div.2002) (noting error of reliance on scope of anti-discrimination statutes like ADA to limit LAD's broad protections); *Enriquez v. W. Jersey Health Sys.,* 342 *N.J.Super.* 501, 519, 777 *A.*2d 365 (App.Div.) (noting LAD's protections are broader than other state anti-discrimination statutes), *certif. denied,* 170 *N.J.* 211, 785 *A.*2d 439 (2001). The LAD's purposes suggest that we chart a course to permit plaintiffs to proceed against employers who have failed to reasonably accommodate their disabilities or who have failed to engage in an interactive process even if they can point to no adverse employment consequence that resulted. Such cases would be unusual, if not rare, for it will ordinarily be true that a disabled employee who has been unsuccessful in securing an accommodation will indeed suffer an adverse employment consequence.

That is, the disabled employee who is denied a requested reasonable accommodation necessary to perform the job's essential functions will generally, as a result, not be hired or promoted, or will be discharged. Indeed, it is difficult for us to envision factual circumstances in which the failure to accommodate will not yield an adverse consequence. But there may be individuals with disabilities who request reasonable accommodations, whose requests are not addressed or are denied, and who continue nonetheless to toil on.

Perhaps in those circumstances the employee could demonstrate that the failure to accommodate forced the employee to soldier on without a reasonable accommodation, making the circumstances so unbearable that it would constitute a hostile employment environment. But there also might be circumstances in which such an employee's proofs, while falling short of that standard, would cry

out for a remedy. We cannot foresee all of the factual settings that might confront persons with disabilities and, although hard to envision, we therefore cannot entirely foreclose the possibility of circumstances that would give rise to a claim for failure to accommodate even without an identifiable adverse employment consequence.

In spite of our recognition that the broad remedial sweep of our LAD demands vigilance in our protection of the rights of persons with disabilities, and as compelling as their plight is in facing workplace challenges that are uniquely theirs, we are constrained to refrain from resolving today the question of whether a failure to accommodate unaccompanied by an adverse employment consequence may be actionable. We do so because, in the end, this record is a poor vehicle in which to find the definitive answer to that important question. Looking at plaintiff's evidence, this record simply does not permit him to recover for a failure to accommodate, for two reasons that are entirely separate from his concession that he suffered no adverse employment consequence.

First, there is no evidence in this record that plaintiff was disabled on December 11, 2003, the only date when he asserts he was not accommodated. Although it is certainly true that he had a long medical and psychological history that qualified him as disabled, his unsupported demand to be relieved of the requirement that he go on the road in his capacity as a full-duty road trooper was not based on those disabilities. Instead, his complaint was that after he had been cleared for a return to full duty, he had sustained a new but undocumented back injury, and he believed that the new back injury qualified him as a person with a disability who was entitled to an accommodation. In light of the absence of any evidence to demonstrate that he had an injury on the day to which he has pointed throughout his litigation, his proofs on the prima facie case for failure to accommodate on December 11, 2003, would fail on the first prong, without regard to how we articulate any of the other elements of his proofs. *See Viscik, supra,* 173

*N.J.* at 16, 800 *A.*2d 826 ("Where the existence of a handicap is not readily apparent, expert medical evidence is required.").

Second, there is no evidence that plaintiff sought a reasonable accommodation as we or any other court has defined it. Courts have uniformly concluded that the employer's duty to offer a reasonable accommodation does not cloak the disabled employee with the right to demand a particular accommodation. *See, e.g., Vande Zande v. Wis. Dep't of Admin.,* 851 *F.Supp.* 353, 359 (W.D.Wis.1994) (concluding that "[a]lthough the ADA requires an employer to provide reasonable accommodations, an employer need not accommodate an employee in the manner that an employee requests or provide the employee with the 'best' possible accommodation") (citing 29 *C.F.R.* App. § 1630.9), *aff'd,* 44 *F.*3d 538 (7th Cir.1995).

As we have commented, reasonable accommodation " 'refers to the duty of any employer to attempt to accommodate the *physical disability* of the employee, *not* to a duty on the part of the employer to acquiesce to the disabled employee's requests for certain benefits or remuneration.' " *Raspa, supra,* 191 *N.J.* at 339, 924 *A.*2d 435 (quoting *Jones, supra,* 339 *N.J.Super.* at 426, 772 *A.*2d 34) (rejecting employee's demand for creation of full-time light duty position). Our appellate courts have similarly recognized that not every accommodation demand is a reasonable one. *See, e.g., Tynan, supra,* 351 *N.J.Super.* at 397, 798 *A.*2d 648 ("An employer's duty to accommodate ... does not require acquiescence to the employee's every demand.") (citation and internal quotation marks omitted); *Hennessey v. Winslow Tp.,* 368 *N.J.Super.* 443, 452, 847 *A.*2d 1 (App.Div.2004) (explaining that employers need not accommodate employee's disability if employee is unable to perform essential job functions), *aff'd,* 183 *N.J.* 593, 875 *A.*2d 240 (2005); *Muller, supra,* 345 *N.J.Super.* at 606, 786 *A.*2d 143 (explaining that LAD does not require employer to accommodate employee with light-duty assignments, indefinite part-time work schedules, elimination of essential job function or creation of new position); *Bosshard, supra,* 345 *N.J.Super.* at 91, 783 *A.*2d 731

(quoting *Vande Zande, supra,* 851 *F.Supp.* at 362 and explaining LAD should be similarly interpreted).

Likewise, "[i]f more than one accommodation would allow the individual to perform the essential functions of the position, 'the employer ... has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.'" *Kiel v. Select Artificials, Inc.,* 169 *F.*3d 1131, 1136–37 (8th Cir.) (citing 29 *C.F.R.* App. § 1630.9), *cert. denied,* 528 *U.S.* 818, 120 *S.Ct.* 59, 145 *L.Ed.*2d 51 (1999). Engaging in the interactive accommodation process "does not dictate that any particular concession must be made by the employer ... [but instead what it] requires is that employers make a good-faith effort to seek accommodations." *Taylor, supra,* 184 *F.*3d at 317 (internal citation omitted).

Considered in that context, plaintiff's claim fails because to the extent that he believed he had an injury on December 11, 2003, he had available to him a wide and generous array of accommodation options not available to most employees. He had the right to report himself sick, to report to the division doctor, and to request leave. Instead of taking advantage of any of those accommodations, he reported for duty and asked an officer who was not authorized to change his duty status to allow him to work, as a full-duty road trooper, in the station doing administrative work. That request equates with a demand that a new position be created or that an accommodation that he preferred be given to him when others were available. We do not understand the LAD or the ADA to afford him that right. Moreover, later that day, when plaintiff was ordered to go out on the road, he still had the ability to take sick leave rather than comply. His choice not to do so supports our conclusion that he cannot sustain his burden of proving that he was denied a reasonable accommodation.

We concur, therefore, in the Appellate Division's judgment that the verdict must be reversed and the matter remanded for a new trial. We do so not based on that court's conclusion that there can

be no claim for failure to accommodate absent an adverse employment consequence, because we have found this record an inappropriate one on which to decide that important question. Rather, we do so because, regardless of whether or not there is room in the LAD's strong protective embrace of persons with disabilities to recognize that there may be circumstances in which a failure to accommodate in and of itself gives rise to a cause of action, this plaintiff's claim for failure to accommodate cannot meet the proofs required on his prima facie case.

## VII.

The judgment of the Appellate Division is affirmed as modified and the matter is remanded to the trial court for further proceedings consistent with this opinion.

*For affirmance as modified/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.