**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2928-21

ANDREW J. KRASSOWSKI,

 Plaintiff-Appellant,

v.

BLOOMBERG L.P.,

 Defendant-Respondent.

_____

Argued September 14, 2023 – Decided January 9, 2024

Before Judges Vernoia, Gummer, and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-0364-20.

Charles Z. Schalk argued the cause for appellant (Savo, Schalk, Corsini, Warner, Gillespie, O'Grodnick & Fisher, attorneys; Charles Z. Schalk, of counsel and on the briefs).

David Wayne Garland argued the cause for respondent (Epstein Becker & Green, PC, attorneys; David Wayne Garland, of counsel and on the brief; Jiri Janko, on the brief).

PER CURIAM

Plaintiff Andrew J. Krassowski contends his employer, defendant Bloomberg L.P., wrongfully terminated him based on his age in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. Plaintiff claims his termination was part of a scheme to replace older workers with younger and lower-paid recent hires. Plaintiff appeals an April 21, 2022 order in which the motion judge granted defendant's summary-judgment motion and dismissed the complaint with prejudice based on his determination plaintiff had failed to demonstrate the circumstances surrounding his discharge supported an inference of age discrimination. We agree and affirm.

I.

We discern the material facts from the summary-judgment record, viewing them in a light most favorable to plaintiff, the non-moving party. See Memudu v. Gonzalez, 475 N.J. Super. 15, 18-19 (App. Div. 2023).

Plaintiff was fifty-three years old when defendant hired him in the summer of 2014 to work as a "Software Engineer-Senior" in its Research & Development (R&D) department. Plaintiff initially reported to Raju Dantuluri, an Engineering Team Leader who was then forty-three-years old and had interviewed plaintiff and had recommended defendant hire him. In February

2

2018, plaintiff began reporting to Neeraj Jain, an Engineering Team Leader, and Dantuluri became plaintiff's "skip-level" manager, meaning Dantuluri was one level above Jain. Plaintiff reported directly to Jain for the duration of his employment, and Jain continued to report to Dantuluri.

Plaintiff initially worked on developing and testing various vendor-related functions of defendant's databases in the R&D ISYS Supply Chain Department. In plaintiff's 2015 interim review, which was his first review, Dantuluri wrote plaintiff could "accomplish some of [his] tasks faster" and that he "expected him [to] . . . be able to deliver faster." He rated plaintiff's overall performance as "Meets Expectations." Plaintiff received an overall numerical rating of "3.5" out of "6," a rating that fell between "Good – Occasionally Exceeds Expectations" and "Meets Expectations."

In plaintiff's 2015 year-end performance evaluation, Dantuluri wrote that "[a]lthough, overall [plaintiff] has met expectations of his business sponsor, the timeframe for his deliverables [was] longer than expected for someone with his experience and knowledge." Dantuluri wrote that on another project, "business was satisfied with the benefits obtained . . . but the quality of the initial release [of the project] was below [Dantuluri's] expectations where we had to do multiple patches in order to get it right. [His] expectations [for plaintiff were]

3

higher due to his level of experience." For the year 2015, plaintiff received an overall rating of "3.4," which meant he had been rated "Above Expectations," with "1" being the highest and best rating and "6" being the lowest.

In plaintiff's 2016 performance evaluation, Dantuluri wrote plaintiff had been "hired with high expectations . . . . Although he has contributed more on the process front, he is also expected to be able to handle multiple projects in parallel and also be more aggressive in delivering solutions while maintaining the quality of the deliverables." Dantuluri also noted "occasions where [plaintiff's] estimates were significantly higher than th[ose] expect[ed from] a senior developer." Plaintiff received a "3.4" rating for the year; however, defendant had changed from a six-point to a five-point rating scale, and plaintiff's score meant he had "achieve[d] results in line with expectations and exceed[ed] expectations in a limited area." Plaintiff did not receive any base salary raises after 2016.

In 2017, plaintiff moved to the Travel and Expense (TNE) subteam. The TNE system had a much larger user base and was highly visible within Bloomberg. Plaintiff was expected to work closely with other team members, deliver solutions in an aggressive timeframe, and be able to work on multiple

initiatives and tasks simultaneously. Plaintiff was the oldest member of the team.

In plaintiff's 2017 performance evaluation, Dantuluri again rated plaintiff "3.4," which was the lowest score of all the employees in the TNE subteam. Dantuluri wrote in the performance review that "[b]eing a senior developer, [plaintiff] is expected to independently partner with business, manage bigger [and] complex projects and also be able to handle multiple projects at a time. [Plaintiff] fell short on expectations to demonstrate these skills adequately while working on [the] above mentioned projects." Dantuluri wrote that plaintiff "struggled to understand" certain concepts, "kept trying to investigate without reaching out to another team which . . . could have helped him on resolving those technical challenges," and "did not meet [certain] expectation[s] and this along with some other factors resulted in a few weeks delay." With respect to "implementation of agreed upon processes," Dantuluri found plaintiff "does not always follow them" even though he was "expected to follow and champion them." Dantuluri wrote plaintiff "has to be more aggressive in delivering solutions while maintaining the quality of the deliverables. There are occasions where his estimates were significantly higher than the expectation of a senior developer."

A-2928-21

For 2018, Jain rated plaintiff "4.0," which meant he had "achieve[d] some results but d[id] not meet all expectations." Plaintiff was again the lowest rated employee on the TNE subteam. In plaintiff's performance evaluation, Jain wrote that "[o]verall, he did a good job completing his tasks on time and his efforts towards reducing the file size were well appreciated." However, "[b]eing a senior engineer, [plaintiff] is expected to be more thorough and diligent" with certain projects and that with another project, "he struggled to deliver it on time and went back and forth with other team members to understand the functionality and the design." According to Jain, plaintiff had been "expected to research the existing functionality and also understand the new design prior to starting the development." Jain indicated plaintiff had not "clearly underst[oo]d the design" of a component and stated "[e]xpectation from a senior engineer like [plaintiff] is to not just build software but also understand the capabilities and limitations of the software and be able to explain them to others."

In 2018, Bloomberg retained two contractors: John Saponara and Sudhanshu Kumar. In April 2019, they were hired as "regular" employees. When Bloomberg terminated plaintiff's employment the following year, Saponara was fifty-seven years old, and Kumar was thirty-three years old.

6

Plaintiff received an interim performance evaluation in 2019. According to Jain, an employee received a mid-year review if the employee was new or if there were "serious concerns" about the employee's performance. According to Dantuluri, plaintiff received an interim performance evaluation in 2019 because he was "[n]ot performing up to expectations." Jain prepared the written evaluation, and Dantuluri reviewed it. Jain wrote:

> There are areas where [plaintiff] is not meeting expectations. These areas have been highlighted during year-end evaluations for [a] couple of years as well as during one-on-one meetings. [Plaintiff] has not made any significant progress in these areas towards meeting expectations and is expected to work on these areas immediately . . . .

While acknowledging plaintiff had done "a good job" on certain aspects of some projects, Jain wrote plaintiff on one project had been "unable to explain [the implementation plan] and it was apparent that he didn't understand the design. As a result, his manager had to re-explain the design workflow and monitor closely to keep him focused on the remaining tasks to ensure success of the project." Regarding another project, Jain wrote that plaintiff "started coding based on the sample file," which was "different than the specification, . . . instead of escalating to raise [an] issue with the vendor about the mismatch. He also didn't actively follow up with other Bloomberg teams until reminded," which

7 <span>A-2928-21</span>

"resulted in delay . . . ." Regarding another project, Jain faulted plaintiff for having "started coding without validating the design and thinking through how it should be done" and for not "following the principles and guidelines agreed to by the team . . . . It is expected from a senior engineer like [plaintiff] to remember and follow agreed upon processes and get the design reviewed prior to start coding to save his and others time."

Plaintiff received a "4.0" score for that evaluation, which again meant he had "achieve[d] some results but d[id] not meet all expectations." The evaluation provided that plaintiff was expected in the remaining year to focus on being "more aggressive in software development" and in "[w]ork[ing] more independently," among other things.

In an October 9, 2019 email, Yelena Naginsky, the human resources business partner supporting plaintiff's team, reported to Brenda Clark, an employee relations and compliance specialist, that she had met with Jain regarding "performance concerns" about plaintiff. Naginsky advised Clark that based on plaintiff's "history of underperformance," citing the "4.0" scores in his last two evaluations, "and the lack of improvement following the [i]nterim and subsequent conversations," she was "comfortable with moving forward to the [m]utual [separation] or [written warning] option at this point" and asked for

8

Clark's "take on the situation and if [she] agree[d] that we should move forward with those options." Clark responded that she had met with Jain and Dantuluri the previous week and "agree[d] because [plaintiff's] been getting the feedback but no change." Jain and Dantuluri told her they "had been giving plaintiff feedback about the performance deficiencies" but had not seen the improvement they needed to see and, consequently, wanted to give plaintiff a written warning. Clark read plaintiff's performance evaluations, obtaining a sense of what feedback previously had been provided to plaintiff, and advised Jain and Dantuluri she was comfortable issuing a written warning.

In an October 28, 2019 email, Clark asked her supervisor Deborah Barker to review the request for the mutual separation package for plaintiff, which would give plaintiff the option to leave Bloomberg with a separation package or to remain employed with a written warning. In response, Barker wrote:

> The interim doesn't have a lot of info and there are no eval notes that I can see. There is no verbal that's really documented anywhere that I can find. . . . I am sure you both have had tons of chats with the managers to validate this, but . . . do you think this guy is at [the written warning] stage (assuming he doesn't take a mutual)? Unless there has been a lot of conversations that took place undocumented, there does not look like he's had much direct feedback. Just double checking because of risk factors.

A-2928-21

According to Barker, one of the risk factors associated with terminating plaintiff was plaintiff's age. Clark explained to Barker she was comfortable with issuing a written warning if plaintiff declined the mutual separation package because plaintiff had received a verbal warning during his 2019 interim review, the interim performance evaluation indicated plaintiff was not meeting expectations in certain areas and had not been making any progress in those areas despite having been given the same feedback over several evaluation periods, and his managers had told her the "conversation with plaintiff at that time was very clear and they have since discussed concerns with missing deadlines and not working independently." Barker ultimately approved the request for a mutual separation package.

On October 31, 2019, Jain, Dantuluri, and Clark met with plaintiff and told him that he "could either leave the company then or start a performance improvement program." They explained "there was an opportunity [for him] to go through a formal performance review to demonstrate that [he] was making progress and contributing to the level that they thought was appropriate for a senior member of the team." The next day, plaintiff told Dantuluri he "wanted to try and go through this performance improvement session" but also "want[ed] to hear that there was a possibility of a positive outcome." Dantuluri "assured

10

[him] that this was done in good faith and that this was an opportunity for [him] to demonstrate improvement and continue [his] career at Bloomberg." Plaintiff then advised Clark he would continue at Bloomberg.

On November 22, 2019, Dantuluri, Jain, and Clark met with plaintiff to present the written warning to him. His managers made clear to him they were not satisfied with his performance. The warning outlined "continuing areas of serious concern with [plaintiff's] performance," identifying special concern with plaintiff's purported inability to "complete the tasks assigned to [him] in a timely manner," "demonstrate an understanding of the functionality [he] own[ed]," and "follow coding processes discussed and agreed [on] by the team." The warning advised plaintiff that "fail[ure] to follow the procedures outlined in this memorandum . . . [or] to meet the expected levels of performance" might result in his termination. Plaintiff signed the document, acknowledging that he had received and discussed it.

After giving him the written warning, Jain met with plaintiff about every two weeks, coinciding with the conclusion of a "sprint," meaning an assignment. During those meetings, Jain conveyed his dissatisfaction with some aspects of plaintiff's performance. Plaintiff testified that at those meetings Jain had "agreed that performance had been improved, transparency and communication

w[ere] better," but "there's room for further improvement. . . . if there were a letter grade [he] was probably getting a B and [he] should be getting an A." For example, during a December 6, 2019 meeting, Jain told plaintiff that out of three tasks assigned to him, plaintiff had completed one successfully and in excess of expectations but had not completed the other two timely. Plaintiff met expectations in the next sprint; Jain gave him additional assignments and continued to monitor him. In his 2019 year-end review, plaintiff received a "4.5" rating, once again the lowest of his team. Plaintiff did not receive a bonus for 2019; in prior years, he had received a bonus of $28,500.

On January 17, 2020, Jain and Dantuluri met with Clark to discuss plaintiff's progress. They told her he had been "meeting the tasks in the sprints for the most part," but he had not used the correct approach in a more complex assignment. Jain and Dantuluri agreed to meet with plaintiff again to "explain that while on the surface, it might look like he's making some progress, they are seeing him still struggle with one of the [three] deficiencies addressed in his written warning, independent problem solving" and that "they can't sustain having someone unable to navigate through ambiguity." They planned to "give him a new sprint that w[ould] require him to do so on his own and if [he] isn't able to, term[ination] w[ould] be the next step."

12

At their meeting that day with plaintiff, Dantuluri advised plaintiff they had seen "improvement in some areas but [they] also [had seen] a pattern where some complex tasks require[d] additional help and/or t[ook] longer to finish." Dantuluri told plaintiff he would "have a task of this nature" in the "upcoming sprint" and that it was "critical that [he] complete this [assignment in a] timely manner without much additional help."

In a January 31, 2020 email, Jain wrote to Dantuluri that plaintiff had completed one task as expected, one task was partially completed and delayed for reasons apparently unrelated to plaintiff, and plaintiff failed to complete a third task timely even though plaintiff had worked "both weekends and long hours on weekdays. My concerns are on his ability to complete the bigger [and] complex task in [a] timely manner while maintaining the same quality." Jain also wrote to Clark that day, stating that with plaintiff, "some complex tasks require additional help and/or take[] longer to finish. As mentioned before, this is not sustainable and as a result, we recommend terminat[ing] his employment." In a February 6, 2020 email, Dantuluri told Clark, "I don't want to wait until the following week as it would be around three weeks from the time he failed on the task. Also, if he delivers his next task on time, it would make it more difficult."

A-2928-21

Clark created a request for termination for plaintiff and wrote that plaintiff had been receiving repeated feedback since 2017 "that he needs to work more independently and on more complex projects." She wrote that while working on the performance goals for his warning,

> he wasn't able to complete the more complex work on time. . . . [Plaintiff's] managers feel termination is appropriate in this case because [plaintiff], despite his best efforts, is unable to contribute the way they need him to. Because he needs so much support on complex work, he's monopolizing time and resources from others and slowing deliverables which is no longer sustainable.

On February 11, 2020, Barker approved the termination request.

During a February 12, 2020 meeting Clark also attended, Dantuluri presented plaintiff with a termination package and advised him that although he had made some progress, "it was not sufficient progress fast enough." Bloomberg offered plaintiff a $25,615 severance payment in exchange for releasing claims he might have; plaintiff rejected the offer.

When he was terminated, plaintiff was fifty-eight-years old; the other team members were thirty-three, thirty-seven, forty-five, fifty-five, and fifty-seven years old. After terminating plaintiff, Bloomberg did not hire anyone new to replace him, and his unfinished work was assigned to other team members.

A-2928-21

Plaintiff filed a complaint, alleging defendant had engaged in unlawful age discrimination and unlawful employment practices in violation of the LAD. After the close of discovery, defendant moved for summary judgment. After hearing argument, the motion judge granted the motion in an order and written statement of reasons. The judge found plaintiff had not satisfied the fourth element of a prima facie age discrimination claim; defendant had articulated a legitimate, nondiscriminatory reason for terminating plaintiff's employment; and plaintiff had failed to demonstrate defendant's legitimate reason for terminating his employment was a pretext for age discrimination.

On appeal, plaintiff argues the judge erred in granting defendant's motion because defendant wrongfully had replaced plaintiff with younger employees before his termination, plaintiff had demonstrated sufficient evidence of pretext, and genuine issues of material fact existed. Unpersuaded by those arguments, we affirm.

II.

We review a grant or denial of summary judgment de novo, applying the same standard as the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if

A-2928-21

any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). We do not defer to the trial court's legal analysis or statutory interpretation. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014).

The LAD prohibits employment discrimination based on an employee's age. N.J.S.A. 10:5-4 & -12. Specifically, N.J.S.A. 10:5-12(a) provides:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or an employer, because of the . . . age . . . of any individual . . . to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]

In assessing an age-discrimination claim based on circumstantial evidence, New Jersey courts rely on the burden-shifting test articulated in

16

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973), and adopted by our Supreme Court in Viscik v. Fowler Equip. Co., 173 N.J. 1, 13-15 (2002). See Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005).  Thus, a plaintiff claiming age discrimination must first present evidence establishing a prima facie case of discrimination.  Victor v. State, 203 N.J. 383, 408 (2010).  "[T]o successfully assert a prima facie claim of age discrimination under the LAD, plaintiff must show that:  (1) [he] was a member of a protected group; (2) [his] job performance met the 'employer's legitimate expectations'; (3) [he] was terminated; and (4) the employer replaced, or sought to replace, [him]."  Nini v. Mercer Cnty. Cmty. Coll., 406 N.J. Super. 547, 554 (App. Div. 2009) (quoting Zive, 182 N.J. at 450).

Satisfaction of the fourth element "require[s] a showing that the plaintiff was replaced with 'a candidate sufficiently younger to permit an inference of age discrimination.'"  Bergen Com. Bank v. Sisler, 157 N.J. 188, 213 (1999) (quoting Kelly v. Bally's Grand, Inc., 285 N.J. Super. 422, 429 (App. Div. 1995)); see also Smith v. Millville Rescue Squad, 225 N.J. 373, 395 (2016) (finding that to satisfy the fourth element, a plaintiff alleging a discriminatory discharge "must show . . . the employer thereafter sought similarly qualified individuals for that job") (quoting Victor, 203 N.J. at 409); Young v. Hobart West Grp., 385 N.J.

17

Super. 448, 459 (App. Div. 2005) (same). However, it is not enough for the replacement to merely be younger; "'[t]he focal question is . . . whether the claimant's age, in any significant way, "made a difference" in the treatment he was accorded by his employer.'" Ibid. (quoting Petrusky v. Maxfli Dunlop Sports Corp., 342 N.J. Super. 77, 82 (App. Div. 2001)). To prove age discrimination, a plaintiff must demonstrate age "played a role in the decision making process and that it had a determinative influence on the outcome of that process." Garnes v. Passaic Cnty., 437 N.J. Super. 520, 530 (App. Div. 2014) (quoting Bergen Com. Bank, 157 N.J. at 207).

If the plaintiff demonstrates a prima facie case of age discrimination, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment action. Bergen Com. Bank, 157 N.J. at 209-10. If the employer shows a legitimate non-discriminatory reason for the adverse action, the burden shifts back to the plaintiff to show the employer's proffered reasons were pretextual. Id. at 210-11; see also Spinks v. Twp. of Clinton, 402 N.J. Super. 465, 482 (App. Div. 2008) (same). "To prove pretext, a plaintiff may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent."

Zive, 182 N.J. at 449. The plaintiff must persuade the court "he was subjected to intentional discrimination." Ibid.

We are satisfied plaintiff did not demonstrate that age played a significant role in his termination and, thus, did not establish a prima facie case of age discrimination. In Smith, 225 N.J. at 398, the plaintiff supported a circumstantial case of discrimination by "testif[ying] at length about his employment history, including promotions, regular pay increases, and the lack of any criticism or poor performance evaluations." In contrast, plaintiff had not had any promotions, had not received an increase in his base salary since 2016, had consistently in his evaluations received criticism for, among other things, having "timeframe[s] for his deliverables [which] were longer than expected for someone with his experience and knowledge," and had been the lowest rated person on his subteam in the three years before his termination.[1]

---

[1] Plaintiff's reliance on Saffos v. Avaya Inc., 419 N.J. Super. 244 (App. Div. 2011), is misplaced. That case was decided not on a summary-judgment motion but after a jury trial, which included evidence that the plaintiff had been terminated after twenty years and replaced by a woman fourteen years younger than him who did not have comparable experience in plaintiff's field, several other older employees had been terminated and replaced by significantly younger people, and the supervisor at issue had engaged in "favored treatment of his younger, mostly female, new hires." Id. at 252-57. In addition, the focus of the decision was on the punitive-damage and counsel-fee awards, not on any underlying liability issues. Id. at 259.

A-2928-21

Plaintiff was fifty-three-years old when he was hired and fifty-eight-years old when he was terminated. "Courts have rejected age discrimination claims when a plaintiff was both hired and fired while a member of the protected age group." Young, 385 N.J. Super. at 461. Dantuluri, who had recommended defendant hire plaintiff, was forty-eight-years old and Jain was forty-one-years old when plaintiff was terminated. "Courts have found discriminatory intent lacking where the decision-makers are over forty when the employment decision was made." Ibid.; see also ibid. (that the same person promoted the plaintiff and later recommended the elimination of her position "counters against an inference of age discrimination").

Specifically as to the fourth element of a prima facie discrimination case, plaintiff failed to establish that, having terminated plaintiff, defendant "thereafter sought similarly qualified individuals for that job." Smith, 225 N.J. at 395 (quoting Victor, 203 N.J. at 409). Plaintiff does not dispute that after his termination, defendant did not hire anyone to replace him and his workload was distributed to existing subteam members. Instead, plaintiff claims defendant's hiring of Kumar and Saponara, who were retained as contractors in 2018, was "an excuse to push him out." But arguments based on assumptions or speculation are not enough to defeat a summary judgment motion. See Dickson

v. Cmty. Bus Lines, Inc., 458 N.J. Super. 522, 529 (App. Div. 2019) ("'[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome' summary judgment motions." (quoting Puder v. Buechel, 183 N.J. 428, 440-41 (2005))); Hoffman v. AsSeenOnTV.com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009) ("Competent opposition [to a summary judgment motion] requires 'competent evidential material' beyond mere 'speculation' . . . ." (quoting Merchs. Express Money Ord. Co. v. Sun Nat'l Bank, 374 N.J. Super. 556, 563 (App. Div. 2005))). And the distribution of plaintiff's work among existing employees, some of whom were younger, does not by itself rise to the level of showing his termination was due to his age and, thus, was unlawful. See Young, 385 N.J. Super. at 459-60 (finding the plaintiff's duties had been assumed by co-workers, court concluded the plaintiff had not established that age played a significant role in her termination).

Even if plaintiff had established his age was a factor in defendant's decision to terminate him, he failed to demonstrate defendant's proffered legitimate business reason for the termination was a pretext for discrimination. The record does not support plaintiff's assertions that he had had "excellent reviews" and "year after year of excellent performance." The evidence in the record includes written evaluations by two different supervisors, including one

who had recommended defendant hire plaintiff, and the testimony of those supervisors. Their evaluations demonstrate, among other issues, a consistent concern about plaintiff's ability to handle multiple projects and complete them timely with an appropriate level of supervision.

Plaintiff contends his evaluations, including his 2018 year-end rating of "4.0," compared to those of his colleagues was "arbitrary" and that younger members of his subteam had received "the same critiques" but were not terminated. Plaintiff's subjective view of the evaluations is not supported by the record, and his conclusory assertion of arbitrariness is not sufficient to demonstrate discriminatory intent or to defeat summary judgment. See Zive, 182 N.J. at 449 (holding that to prove pretext, a plaintiff must demonstrate the employer's proffered reason was false and that "the employer was motivated by discriminatory intent").

Because plaintiff failed to present evidence establishing a prima facie case of age discrimination and that defendant's legitimate non-discriminatory reason for terminating his employment was a pretext for unlawful age discrimination, plaintiff failed to sustain his burden to support his claim under the LAD. See Young, 385 N.J. Super. at 458-63 (affirming summary judgment because the plaintiff did not establish a prima facie case of age discrimination and did not

22

present sufficient evidence to discredit as pretext the defendant's legitimate reasons for the plaintiff's termination). Accordingly, we affirm the order granting defendant's summary-judgment motion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2928-21